OPINION OF THE COURT
Joseph Harris, J.
By order to show cause, signed August 12, 1994, this matter came on to be heard August 19, 1994, seeking a preliminary and permanent injunction against the New York State Board of Elections and 24 diverse County Boards of Election requiring said defendant-respondents to furnish independent candidates for elective office, including plaintiff-petitioner — a candidate seeking an independent line for the Office of Governor of the State of New York — computerized registration and enrollment records pursuant to Election Law §§ 5-602[1] and 5-604[2] respectively upon the same basis as furnished to political parties and their chairmen. These records were claimed to *407 be necessary in order to comply with the requirements for nominating petitions needed to obtain a position on election ballots in the State of New York. (See, Election Law § 6-140 et seq.)
Because of time constraints, and in order to expedite plaintiff-petitioner’s access to the ballot, a preliminary hearing was held on August 16, 1994 before Supreme Court Justice Joseph Harris. Each of the counties named in the order to show cause was ordered to provide to the court, if they had not already provided same to plaintiff-petitioner, a computerized registration-enrollment record of the entire county, to be turned over to plaintiff-petitioner at the hearing, and the court would determine the cost to be assessed to each disk or tape— namely, an amount "not exceeding the cost of publication”.
Three counties — Rensselaer, Ulster and Washington — appeared at the hearing of August 16. Testimony was taken respecting the charges sought by Rensselaer County for its computerized information. No testimony was taken regarding the charges sought by Ulster and Washington Counties. Plaintiff-petitioner placed into an escrow account held by the court clerk the amount of money sought by the three counties who appeared and the tapes of those counties was turned over to plaintiff-petitioner pending a hearing regarding distribution of the escrowed money. The other counties that did not personally appear before the court on August 16 turned their tapes over to plaintiff-petitioner for either the amount of money plaintiff-petitioner had agreed to pay, or at no charge, or for an amount to be determined by the court.
There are three main allegations raised by plaintiff-petitioner in this lawsuit:
1. That Election Law §§ 5-602 and 5-604 are facially unconstitutional in providing preferred access to voter registration lists and voter enrollment lists to political parties and their chairmen over independent bodies and independent candidates;
2. That the form of the petition, and the information respecting the Election District, Assembly District, and Ward of the signatory’s residence as prescribed by Election Law § 6-140 et seq., for independent nominations, is onerous, deprivative of due process and ballot access, and requires strict scrutiny; that in the event that section 6-140 et seq. are held valid, the records generated pursuant to sections 5-602 and 5-604 must be *408 computerized in order for the requirements of section 6-140 et seq. not to be prohibitive of reasonable ballot access.
3. That the manner of computation of the cost of records generated pursuant to Election Law §§ 5-602 and 5-604, by certain County Boards of Election results in a charge to independent bodies, and independent candidates, and all others not constituting political parties and chairmen thereof, invalidly "exceeding the cost of publication.”
Firstly, as a citizen-taxpayer and a person specifically aggrieved by the prohibitive impact of Election Law §§ 5-602, 5-604 and 6-140 et seq., upon his quest for ballot access for the Office of Governor, plaintiff-petitioner has standing to bring this lawsuit. (Cf., Matter of Schulz v State of New York, 81 NY2d 336 [1993]; Society of Plastic Indus. v County of Suffolk, 77 NY2d 761, 773 [1991].)
Secondly, many of the issues raised by plaintiff-petitioner have been ruled upon by the Federal courts subsequent to the inception of the instant lawsuit.
Subsequent to the aforesaid hearings, the United States Court of Appeals for the Second Circuit, in an action brought by plaintiff-petitioner herein, entitled Schulz v Williams,[3] held that Election Law § 5-602 was facially unconstitutional, violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that it allowed and required voter registration records to be provided to political parties and chairmen, unrequested and free of charge, while all others, including independent bodies and independent candidates, must pay the costs of the publication of such records. (See, Bullock v Carter, 405 US 134, 140-144 [1972] [applying the "fundamental rights” strand of equal protection analysis to restrictions that affect First and Fourteenth Amendment rights of voters].)[4]
*409 Peculiarly, the same issue as considered in Schulz v Williams (supra), respecting section 5-602, and held unconstitutional therein, was considered by the United States Supreme Court with respect to the predecessor to section 5-602, namely, section 376 (5) of the Election Law of 1949 (as amended), in Socialist Workers Party v Rockefeller (314 F Supp 984, 997 [SD NY] [three-Judge court], summarily affd 400 US 806 [1970]), and likewise held unconstitutional.
Despite that ruling, the New York Legislature reenacted the provision considered in that case in all material, unlawful respects, but simply under a different number, when it recodified the Election Law in 1976.
In Schulz v Williams (supra), the United States Court of Appeals for the Second Circuit, taking umbrage with the New York Legislature, stated: "The reasons why the courts found the provision invalid in 1970 remain true today and apparently require repeating: 'It is clear that the effect of these provisions * * * is to deny independent or minority parties * * * an equal opportunity to win the votes of the electorate. The State has shown no compelling state interest nor even a justifiable purpose for granting what, in effect, is a significant subsidy only to those parties which have least need therefor.” (Schulz v Williams, 44 F3d, at 60, citing Socialist Workers Party v Rockefeller, 314 F Supp, at 995-996, supra.)
An ancillary issue raised by the plaintiff-petitioner in the instant case is immediately thereafter answered in Socialist Workers Party: "The State is not required to provide such lists [registration and enrollment] free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them.” (Socialist Workers Party v Rockefeller, 314 F Supp, at 995-996, supra.)
Election Law § 6-140 requires that petitions for independent nominations indicate the signer’s Election District (ED), Assembly District (AD) (applicable in New York City and the towns of Nassau County) and Ward (W) (if any).
Plaintiff-petitioner claims that this restriction, especially when combined with sections 5-602 and 5-604, places not only an unconstitutional burden on his First and Fourteenth Amendment rights to associate and to have candidates of his choice placed on the ballot, but a discriminatory one as well. (See, Burdick v Takushi, 504 US 428, 434 [1992].)
In Schulz v Williams (supra), the Second Circuit summarized and held: "The Supreme Court has recently made clear that *410 while voting enjoys constitutional protection, every law that imposes a burden on the right to vote need not be subject to strict scrutiny. Those regulations that impose 'severe’ restrictions 'must be narrowly drawn to advance a state- interest of compelling importance.’ Burdick [v Takushi, 504 US 428] * * * 'But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions” * * * "the State’s important regulatory interests are generally sufficient to justify” the restrictions.’ Burdick, [504 US 428, 434] (quoting Anderson v. Celebrezze, 460 U.S. 780, 788) * * * see also, LaRouche v. Kezer, 990 F.2d 36, 39-40 (2d Cir. 1993).” (Schulz v Williams, 44 F3d, at 56, supra.)
Starting with the premise contained in Election Law § 6-154, that a petition, including that of an independent body, is presumptively valid, the Second Circuit in Schulz v Williams (supra) went on to hold that the burden placed by section 6-140 on the right to vote was not a "severe” one, requiring strict scrutiny, but only a "slight burden”, requiring only an evaluation of whether the restriction to ballot access caused by the ED, AD and W requirements " 'unreasonably interfere[s]’ with the effort to place a candidate on the ballot.” (Supra, at 57, citing Burdick v Takushi, supra, 504 US, at 434.) "Having concluded that the burden imposed is not severe, it follows that we do not apply strict scrutiny to the statutory requirement. Rather, we need to evaluate only whether the requirement is justified by 'legitimate interest’ [of the governmental unit promulgating same] and is a 'reasonable way of accomplishing this goal.’ ” (Schulz v Williams, supra, at 57, citing Burdick v Takushi, 504 US, at 440, supra.)[5]
Respecting the authority of the Second Circuit Court of Appeals in matters concerning interpretation of the United States Constitution, this court is accordingly bound to that extent by the rulings set forth in Schulz v Williams (supra). Moreover, this court, without intending to be presumptuous, finds those rulings sound and persuasive. This becomes relevant when the same issues are considered under the New York Constitution, *411 the interpretation of which is not a function of the Federal courts.
A State statute, duly enacted, is presumed constitutional under both the United States Constitution and the New York Constitution (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [c]). The burden is on the antagonist to prove, beyond a reasonable doubt, otherwise (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [b]). In the instant case plaintiff-petitioner, with respect to the New York Constitution (except for those statutory requirements held unconstitutional under the United States Constitution in Schulz v Williams), has failed to sustain this burden. Inasmuch as Election Law § 5-602 has already been held unconstitutional under the United States Constitution by Schulz v Williams (supra), the constitutionality thereof under the New York Constitution need not be passed upon by this court, and this court does not do so. With respect to Election Law § 5-604, the constitutionality of which under the Federal Constitution was, for appellate procedural reasons, not ruled upon by the Second Circuit in Schulz v Williams, this court, for all the reasons hereinbefore stated, and upon the precedent of the Second Circuit respecting section 5-602, finds unconstitutional under the United States Constitution to the extent hereinafter stated, and to the extent permitted under the pleadings herein, unconstitutional under the New York Constitution to the same extent as section 5-602. Finally, with respect to Election Law § 6-140, applying the New York Constitution to the extent permitted by the pleadings, this court comes to the same conclusion as the Second Circuit, under the United States Constitution — namely, that said section is constitutional.
The caveats implied above refer to the extent to which the declarations of unconstitutionality vitiate the respective statutes involved — whether in their entirety or, if possible and practicable, to. a lesser extent. The opinion of the Second Circuit in Schulz v Williams (supra) is less than clear on this point.
The prime purpose of Election Law §§ 5-602 and 5-604 respectively is to require County Boards of Election to compile voter registration and enrollment lists to aid in the furtherance of New York’s system of ballot access by petition. That system, which includes section 6-140, held constitutional by the Second Circuit in Schulz v Williams (supra), and similar sections of the Election Law, have long been held to reasonably serve a legitimate State interest with only a reasonable slight
*412 burden on ballot access.[6] Sections 5-602 and 5-604 are adjuncts to that system, providing means for verification of requirements for signatories to petitions, fully legitimate and reasonable except for that portion of the respective sections that discriminate between political parties on the one hand and independent bodies and independent candidates on the other with respect to payment for records and information furnished. If the sections required the same charge to all, regardless of political or nonpolitical affiliation ("not exceeding the cost of publication”), for the information compiled by Boards of Election pursuant to sections 5-602 and 5-604, these sections in all probability would not be unconstitutional under either the Federal or State Constitution (see, Socialist Workers Party v Rockefeller, 314 F Supp 984, 995-996, supra).
The information compiling subsections of sections 5-602 and 5-604 are not inextricably intertwined with the payment sections and the latter, without wreaking havoc to the intent of the Legislature, may be readily and reasonably severed from the former, so as to delete the payment subsections, substituting therefor the provisions of section 87 of the Public Officers Law (Freedom of Information Law) which prescribes a charge for information sought by anyone of not more than the "actual cost” of "reproducing” the record furnished. (See, McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [d].) Schulz v Williams (supra) not specifically proscribing this procedural device and this procedural device producing legally the same result sought by the Second Circuit and not unreasonably intruding upon the integrity and legislative intent of the two statutes, this court herein adopts said procedural device of severance respecting Election Law §§ 5-602 and 5-604, retaining the information compiling subsections and discarding the payment subsections, substituting for everyone equally (except the State Board of Elections, for whom a mandated free copy imposes no burden to anyone’s ballot access), either no charge, at the discretion of the governing body of the County Board of Elections, or some charge, to be determined by each respective County Board of Elections or its governing body, not exceeding the actual cost of reproducing the record sought.
A part of the equation utilized by the Second Circuit in Schulz v Williams (supra) in determining the constitutionality of New York’s system of ballot access under Election Law § 6-140 and diverse similar sections was the reasonability of *413 the total burden on such access created by said Election Law as a whole. Thus changing any part of that equation might conceivably shift New York’s system of ballot access from constitutional to unconstitutional.
The requirement of Election District, Assembly District and Ward designations for all signatories to designating and nominating petitions in order to combat fraud and irregularities in said petitions was constitutionally acceptable to the court. Even sections 5-602 and 5-604, needed for petition verification, did not destroy or tilt, one way or the other, the constitutional equilibrium other than their unfair "unequal protection” ramifications, wherein one group of candidates (political) was given a monetary preference over another group of candidates (those not affiliated with a political party). If no charge for the information compiled under sections 5-602 and 5-604 were mandated — i.e., free to everyone for the asking— the constitutional equilibrium approved by the Second Circuit vis-à-vis section 6-140 and similar sections of the Election Law would remain the same.
But that, of course, does not end the inquiry. Ought not counties be reimbursed for the services performed and furnished by them pursuant to State mandate? This appears to have been recognized by the versions of sections 5-602 and 5-604 in fact enacted, wherein the New York Legislature permitted counties to charge for its service to an applicant a charge "not exceeding the cost of publication.”[7]
A charge reasonably reflecting the "cost of publication” would hardly endanger the constitutional equilibrium of New York’s system of ballot access. But the phrase "cost of publication” is susceptible to a myriad formulae in its determination. Regardless of what formula is used, the ultimate charge that is determined thereby cannot be permitted to so enhance the burden of ballot access as to unreasonably prefer the rich over the poor and candidates of political parties over independent candidates, and reduce the concept of ballot access in a free society to an illusion. Some counties in the State of New York make no charge for the information compiled under Election Law §§ 5-602 and 5-604; others charge a sum consisting of direct costs plus indirect ancillary costs, prorated among all *414 applicants for records and information, election oriented and otherwise.[8] As implicit in footnote 8, a candidate seeking ballot access in such a county would be called upon to pay, in the guise of electoral charges, nonelectoral charges constituting a subsidy for nonrevenue producing functions of county government, causing the burden on ballot access to become constitutionally intolerable.
Finally there are counties that charge for electoral services only those costs closely and directly attributable to the cost of reproducing the records sought. These are "direct” costs as opposed to "indirect” costs — as, for example, the cost of a diskette or tape and a reasonable sum for the minuscule time it would take to download thereupon.
This would be in keeping with the ideal of maximum ballot access and minimization of burden thereon, consistent with the constitutional equilibrium sought to be maintained by the Second Circuit in Schulz v Williams (supra) and the cases cited therein, and the Election Law itself.
The language of the Freedom of Information Law (Public Officers Law § 87 [1] [b] [iii]), which limits charges for requested public records to "the actual cost of reproducing” (emphasis added), is elucidating. "Actual cost” would reasonably seem to mean something more finite, direct and less inclusive than "[indirect] cost”, which is a concept as infinite and expandable as the mind of man. "Reproducing” a record certainly does not include "producing” a record in the first place — i.e., compiling the information from which the record is produced. The purpose and intention of the Freedom of Information Law is to further the concept of open government. For this reason charges for public records must be kept to a minimum. In a sense the information compiled by counties under Election Law §§ 5-602 and 5-604 is a part of that concept and charges for that information must be kept to a minimum so as to maximize access thereto.
In a larger sense, ballot access is the foundation of a democratic government; it is the bedrock of a bill of rights that *415 guarantees a full and free interchange of ideas and equal protection of the law. It is the chief bulwark that stands between totalitarianism and a government of and by the People. Government "for the People” may well be a principle to be cherished, but it is government "of and by the People” that raises our Nation to the penultimate and differentiates it from all others throughout the world.
Free and unburdened access to the ballot is the ideal. Absent the feasibility of that as set forth by the court in Schulz v Williams (supra),[9] that which is not necessary to a State’s legitimate interest in holding elections with a minimum of complexity and devoid of fraud, constitutes an unconstitutional burden and must be eliminated. This includes all charges to potential candidates not directly related to the reproduction of the information or records requested. Costs of producing and compiling the voter registration and enrollment lists set forth in sections 5-602 and 5-604 in the first instance are a State mandate, required to effectuate New York’s system of ballot access, and to be borne by the respective counties from their general funds without passing same on to electoral candidates.
Thus the court herein holds that all political parties, all independent bodies, and all potential candidates — whether the candidate of a political party or otherwise — be charged the same charge, if any, for records and information compiled pursuant to Election Law §§ 5-602 and 5-604; that such charge, if any, shall not exceed the "actual” cost of "reproducing” such record and information; that the said actual cost of reproducing the records and information sought may include only the most direct of costs involved in such reproduction and shall *416 not include any indirect costs nor the cost of the compilation of the information constituting the record sought, and shall not constitute a subsidy to any other function of government. In sum, the charge for records and information produced pursuant to Election Law §§ 5-602 and 5-604 shall include costs commencing only from the time the record is ready for reproduction and is requested.[10],[11]
Initially the charge for records and information compiled pursuant to Election Law §§ 5-602 and 5-604 will be set by the respective county involved, considering the factors hereinbefore set forth in this opinion — to reflect only the "actual cost of reproducing the record”, directly attributable only to the request for such reproduced record. Government action is presumed regular and valid until the contrary is shown. (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [b].) The burden thereafter is upon the person or body claiming to be aggrieved to overcome that presumption of regularity and show the determination to be arbitrary and capricious and invalid. Ultimate resort may be had to the courts in a CPLR article 78 proceeding or some other appropriate action or proceeding.
As in Schulz v Williams (supra), reference in this opinion to application of computer technology to the electoral process is not intended to imply that same is constitutionally required. (See, Schulz v Williams, supra, 44 F3d, at 59, n 10.) It is not, under the circumstances of this case, so required. Until, and if, the burden placed upon ballot access by the New York electoral system as established by the Election Law becomes constitutionally intolerable, and there is no evidence of that in this case, the question of computerization is a political question to be determined by the political branches of government. Absent constitutional requirements not here existent, the judiciary is not a super-government with power to impose its wisdom upon the political branches. It may be that computerization of the electoral process is the way to go, but if not required to maintain the constitutional equilibrium, which, once again, has not been demonstrated in this case, such is a *417 determination solely to be made by the executive and legislative branches of government.[12]
One final administrative matter remains with respect to the management of this lawsuit. In the first instance 24 County Boards of Election were named as defendant-respondents. Some of these County Boards of Election have settled their differences with plaintiff-petitioner with respect to their charges for records requested and furnished pursuant to sections 5-602 and 5-604. Few remain to be determined; these have been funded by an escrow account set up by the plaintiff-petitioner with the clerk of the court. With the permission of the Administrative Judge for the Third Judicial District, these unsettled cases respecting the fitness of the charges claimed will be referred to a Judicial Hearing Officer to hear and report, or with the consent of the parties, to hear and determine, in line with the holdings set forth in this decision and opinion.

. Section 5-602 of the Election Law provides as follows:
"§ 5-602. Lists of registered voters; publication of
"1. After the last day of local registration and before the sixth day before the next ensuing general election in each year, the [county] board of elections shall cause to be published a complete list of names and residence addresses of the registered voters for each election district over which the board has jurisdiction. The names for each election district may be arranged according to street and number or alphabetically. Each list shall be prepared in such a manner as to indicate the registrants whose names did not appear on the list of registered voters last published pursuant to the provisions of this section. Lists for all election districts in a ward or assembly district may be bound together in one volume.
"2. The [county] board of elections shall cause a list to be published for each election district over which it has jurisdiction.
"3. The [county] board of elections shall prepare at least fifty copies of such pamphlet and shall send at least one copy of each such list to the state board of elections, at least two copies to the county chairman of each, political party, and shall keep at least five copies for public inspection at each main office or branch of the board. Other copies shall be sold at a charge not exceeding the cost of publication.”

. Section 5-604 provides in relevant part:
"§ 5-604. Enrollment lists; publication-of
"1. The [county] board of elections shall also cause to be published for each election district a complete list of the registered voters of each election district. Such list shall, in addition to the information required for registration lists, include the party enrollment of each voter. At least as many copies of such list shall be prepared as the required minimum number of registration lists The board shall keep at least five copies for public inspection at each main office or branch office of the board. Surplus copies of the lists shall be sold at a charge not exceeding the cost of publication.
"2. Immediately after the publication of such lists the board shall send at least one true copy, duly certified, of each such list to the chairman of the *407 state committee of each political party and to the county chairman of each party and to the state board of elections.”

. 44 F3d 48; No. 1144 — August term, 1994, docket No. 94-9088, decided: November 2, 1994, opinion issued: December 27, 1994.

. The United States Court of Appeals in footnote 11 of Schulz v Williams indicated that it felt Election Law § 5-604, following the same scheme for distribution of enrollment lists as section 5-602 did for voter registration lists, was likewise facially unconstitutional but declined to specifically so rule: "Though we see no reason why the patent constitutional infirmity of section 5-602 would not apply to section 5-604, we decline to review the constitutionality of a provision not specifically considered by the district court.” (44 F3d, supra, at 60.)
As the nisi prius court itself, the court herein is not limited by this procedural rule as was the appellate court in Schulz v Williams (supra).

. To determine the rigorousness of inquiry, a court must evaluate the weight of the burden imposed by the challenged requirement. The Williams court proceeded by a "totality approach”, considering the alleged burden imposed by the challenged provision in light of the State’s over-all election scheme, how independent bodies have fared in the past in their attempts to gain ballot access in New York (see, Storer v Brown, 415 US 724, 742 [1974]), past precedent in which courts have evaluated whether comparable voting regulations imposed an unconstitutional burden, and the evidence presented. (Schulz v Williams, supra, at 52.)

. See, Berger v Acito, 457 F Supp 296 (SD NY 1978).

. See also, Public Officers Law § 87 (1) (b) (iii) (Freedom of Information Law), wherein the phrase used relative to the maximum permitted charge for the furnishing of records is "not in excess of * * * the actual cost of reproducing any other record, except when a different fee is otherwise prescribed by statute.” (Emphasis added.)

. Thus, for illustrative purposes, such a county that has, for example, computerized its entire record keeping and information gathering function for all aspects of county government, might create a Department of Computer Services, and charge an independent candidate seeking ballot access a proportionate share of all sums budgeted for such department, including the cost of main-frame computers, wages of all employed in such department, and perhaps even amortization of the facilities in which the department is housed and the expense of maintaining, heating and air conditioning same.

. "The justification put forth in support of ** * * [restrictions, in ballot access laws] is the state’s interest in limiting the ballot to those candidates who have demonstrated support, and its interest in assuring that the support demonstrated is bona fide and is not the product of fraud or misrepresentation. Organization by election district provides a swift and efficient method of confirming voter registration, defenders of the provision [respecting ED, AD and W requirements] contend. Cf. Rutter v. Coveney, 38 N.Y.2d 993, 994 * * * [1976] [stating that ED and AD requirements are 'designed to facilitate the discovery of irregularities or fraud’ in petitions],
"These interests are by no means novel and have long enjoyed support in the case law. The requirement that a candidate make a preliminary showing of substantial support helps to prevent 'a ballot that is complex and confusing but does not enhance the democratic nature of our political processes.’ LaRouche, 990 F.2d at 39 (citing Jennes v. Fortson, 403 U.S. 431, 442 * * * (1971)). The state is further entitled to take steps to ensure that elections are 'fair and honest.’ Burdick [504 US, at 433] (quoting Storer, 415 U.S. at 730 * * *).” (Schulz v Williams, 44 F3d 57-58, supra.)

. Where the record is a computerized record the charge shall be limited to the cost of a diskette or other computerized tape and a reasonable amount for the salary of the employee downloading said diskette or tape during the time such diskette or tape is being downloaded.

. The State Board of Elections shall receive a free copy of records and information compiled pursuant to Election Law §§ 5-602 and 5-604; the charge for any other government agency shall be at the direction of the county involved.

. It ought to be noted that a 1982 regulation (9 NYCRR part 6207) already authorizes counties to switch their central file registration records— compilations of voter lists from all Election Districts — onto a computerized format.