DA 23-0382

FILED

08/20/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0382

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 182

ACORN INTERNATIONAL,

      Plaintiff and Appellant,

  v.

STATE OF MONTANA, by and through its
SECRETARY OF STATE CHRISTI JACOBSON,

      Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV-2022-229
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Robert Farris-Olsen, David K. W. Wilson, Jr., Morrison Sherwood
Wilson Deola, PLLP, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Michael D. Russell, Alwyn
Lansing, Assistant Attorneys General, Helena, Montana

            Emily Jones, Special Assistant Attorney General, Jones Law Firm,
PLLC, Billings, Montana

Submitted on Briefs:  May 15, 2024
Decided:  August 20, 2024

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    ACORN International (ACORN) sued Secretary of State Christi Jacobsen (Secretary) seeking dissemination of records supporting the "actual cost" of distributing the Montana voter file, along with a declaratory judgment that she violated the "right to know" provisions of Article II, Section 9, of the Montana Constitution. The First Judicial District Court, Lewis and Clark County, granted the Secretary summary judgment on ACORN's claims. ACORN appeals.

¶2    We affirm.

¶3    We restate the issues on appeal as follows:

*Issue One: Did the District Court correctly rule that the Secretary's fees for access to the Montana voter file are lawful?*

*Issue Two: Did the Secretary violate the "right to know" under Article II, Section 9, of the Montana Constitution?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4    In 2005, the Montana Secretary of State moved its voter registration database (voter file) onto Montana VOTES voter registration and election management software (Montana VOTES), implementing directives of the United States congressional Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002) (codified at 52 U.S.C. §§ 20901-21145). HAVA addressed nationwide concern about voting systems and voter access in the wake of the 2000 election, requiring states to implement—among other requirements—the following:

[A] single, uniform, official, centralized, interactive computerized statewide
voter registration list defined, maintained, and administered at the State level

that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State . . . .

52 U.S.C. § 21083(a)(1)(A). Montana statute accordingly provides that the Secretary "shall establish, in a uniform and nondiscriminatory manner, a single official, centralized, and interactive computerized statewide voter registration system . . . ." Section 13-2-107, MCA.[1]

¶5 According to the Secretary, Montana VOTES was "specifically designed to comply with [HAVA]," and it "requires ongoing development and support from third-party providers because the data within the voter information system is not fixed—meaning the data changes from moment to moment."

¶6 The annual cost to maintain Montana VOTES is approximately $565,000, and includes expenses for file servers, applications and support of the applications, security, licensing for system users, database licensing and costs, Citrix licensing and environment costs, and office expenses and staff time.

¶7 The voter file is available to the public upon request. Section 13-2-122(1), MCA. Pursuant to her authority to "collect a charge not to exceed the actual cost of the register, list, mailing labels, or available extracts and reports," § 13-2-122(1), MCA, the Secretary charges $1,000 for a one-time request or $5,000 for an annual subscription to the voter file. Admin. R. M. 44.3.1101.

---

[1] Section 13-2-107, MCA, erroneously cross-references 42 U.S.C. § 15483, which was transferred to 52 U.S.C. § 21083 upon the passage of HAVA.

3

¶8 ACORN is "a national organization that works on issues impacting low-and-moderate income families including housing, living wages, voting rights, and community development." ACORN's "Voter Purge Project" works to "ensure that individuals are not wrongly eliminated from voter files" across the United States.

¶9 On October 27, 2021, ACORN requested access to the voter file "under the 'right to know' provisions of the Montana Constitution, Article II, Sect. 3 [sic], and the Public Records Act, which implements the constitutional provision." ACORN advised the Secretary that its fee was "unreasonably large" and "not justified under the law." ACORN additionally requested "documentation of what the 'actual costs' are for a yearly subscription . . . [to] access it."

¶10 On November 8, 2021, the Secretary responded that the voter file is available to the public, and directed ACORN to the State website where individuals or organizations may pay to receive access. The Secretary advised that the fees for the voter file are set by Admin. R. M. 44.3.1101 pursuant to her statutory authority "to develop and implement a statewide electronic filing system as described in 2-15-404." The Secretary further explained that she is "required to charge for elector lists under 13-2-122, MCA."[2]

¶11 On March 21, 2022, ACORN filed a Complaint and Application for Injunctive Relief (Complaint). The Complaint alleged that the Secretary violated Article II, Section 9, of the Montana Constitution by failing to respond to its public records request. ACORN

---

[2] Section 2-15-404, MCA, mandates the Secretary to "develop and implement a statewide electronic filing system," and establishes the framework for general recordkeeping procedures. Sections 13-2-107-124, MCA include provisions that relate more specifically to voter registration.

sought declaratory judgment that the Secretary "may only charge the actual costs of producing or providing access to the voter information file." ACORN further requested an injunction directing the Secretary to "expeditiously comply with the public information request . . . ."

¶12 On June 13, 2023, the District Court granted the Secretary summary judgment. The District Court ruled that the fees set by Admin. R. M. 44.3.1101 are lawful, and it did not reach ACORN's claim that the Secretary violated Article II, Section 9, of the Montana Constitution.

## STANDARD OF REVIEW

¶13 We review summary judgment rulings de novo, applying the same criteria as the District Court. *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 325, ¶ 14, 385 Mont. 505, 386 P.3d 567.

¶14 "The interpretation and construction of constitutional and statutory provisions is a matter of law which we review de novo, determining whether the court's interpretation and construction are correct." *Reichert v. State*, 2012 MT 111, ¶ 19, 365 Mont. 92, 278 P.3d 455 (citations omitted).

## DISCUSSION

¶15 Article II, Section 9, of the Montana Constitution provides the foundation for Montana's "right to know":

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

5

The "right to know" thus embraces notions of transparent governance which are further guaranteed by statute. *See, e.g.* § 2-3-212, MCA (providing for costs and fees in "right to know" enforcement actions); *see also* § 2-3-202, MCA (defining "meeting" under Mont. Const. art. II, § 9).

¶16    While the Legislature intended for our "right to know" laws to be "liberally construed," § 2-3-201, MCA, they are not without certain limitations. *See, e.g.,* Montana Constitutional Convention, Committee Proposals, February 23, 1972, Vol. II, p. 632 ("The committee intends by this provision that the right to know not be absolute.").

¶17    The "right to know," for example, is often balanced against competing privacy interests protected under Article II, Section 10, of the Montana Constitution. *Yellowstone County v. Billings Gazette*, 2006 MT 218, ¶ 20, 333 Mont. 390, 143 P.3d 135 (citations omitted); *see also Nelson v. City of Billings*, 2018 MT 36, 390 Mont. 290, 412 P.3d 1058. Privacy interests may thus form an exception to the "right to know" under Montana law, and we have articulated factors to aid us in balancing competing transparency and privacy interests. *See State v. Theriault*, 2000 MT 286, ¶ 33, 302 Mont. 189, 14 P.3d 444 (citing *State v. Bassett*, 1999 MT 109, ¶ 24, 294 Mont. 327, 982 P.2d 410).

¶18    The Legislature created an additional limitation on the public's "right to know" when it established that the State may "charge . . . a fee for fulfilling a public information request." Section 2-6-1006(1)(c), MCA. Reflecting a reasonable concern that charging fees for public information may have a chilling effect on requests, the Legislature narrowed the provision by providing that, "[e]xcept where a fee is otherwise provided for by law," a fee charged for a public records request "may not exceed the *actual costs* directly incident

6

to fulfilling the request in the most cost-efficient and timely manner possible." Section 2-6-1006(1)(c), MCA (emphasis added).

¶19　As the District Court noted below, the fee that the Secretary charges for the Montana voter file is "otherwise provided for by law." Section 2-6-1006(1)(c), MCA. Section 13-2-122(1), MCA, provides that the Secretary may "collect a charge not to exceed the *actual cost* of the register, list, mailing labels, or available extracts and reports." (Emphasis added.)

¶20　The crux of the dispute here is whether the Secretary's fees for the voter file exceed the "actual cost of the register, list, mailing labels, or available extracts and reports" under the meaning of § 13-2-122(1), MCA.

¶21　*Issue One: Did the District Court correctly rule that the Secretary's fees for access to the Montana voter file are lawful?*

¶22　ACORN alleges that the Secretary's fees for access to the voter file violate Montana statute and the National Voter Registration Act (NVRA) because the $1,000 per-request charge and $5,000 annual subscription fee under Admin. R. M. 44.3.1101 do not reflect the "actual cost" of reproducing the voter file and are not "reasonable" as contemplated by the United States Congress under 52 U.S.C. § 20507(i)(1).

¶23　The State counters that the plain meaning of the statutes controls, and the "actual cost" of the voter file should be construed to include the annual cost of operating and maintaining the file. The State argues further that the fees it charges comprise just one percent of the annual costs associated with administering Montana VOTES, which are thus "reasonable" under the NVRA.

¶24 Our role in interpreting a statute is to determine the substance it contains. *Mont. Ass'n of Cntys. v. State*, 2023 MT 225, ¶ 10, 414 Mont. 128, 538 P.3d 1136 (citing § 1-2-101, MCA). We will not insert what has been omitted, and we will not omit what has been inserted. *Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 20, 384 Mont. 503, 380 P.3d 771 (citing § 1-2-101, MCA). "We strive to implement legislative objectives in accordance with the statute's plain language." *Mont. Ass'n of Cntys.*, ¶ 10 (citation omitted). Ultimately, our goal is to give effect to the Legislature's intent. When a statutory term has not been defined, we may consider dictionary definitions, caselaw, and the larger statutory scheme in which the term appears. *Giacomelli v. Scottsdale Ins. Co*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666 (citations omitted). "The construction of a statute by the person or agency responsible for its execution should be followed unless there are compelling indications that the construction is wrong." *D'Ewart v. Neibauer*, 228 Mont. 335, 340, 742 P.2d 1015, 1018 (1987) (citation omitted).

¶25 "Actual cost" is not defined under Title 2, chapter 6 or Title 13, chapter 2, MCA, and we find ACORN's citations to dictionary definitions unavailing. Regardless of whether "actual" means "real" and "existing in fact," as ACORN notes, we encounter the same impasse when attempting to ascertain what, exactly, the "real" cost of the "register" that "exist[s] in fact" comprises here. *See* Black's Law Dictionary (3d pocket edition, 2006). The dictionary definitions may be construed to effectuate either party's interpretation. As the District Court noted, the "actual cost of the register" could—but does not necessarily—equate to the "actual cost of [*reproducing*] the register." Had the

8

Legislature intended it to carry such a precise meaning, however, it could have used more precise language.

¶26 Instead, the Legislature resolved to provide the Secretary with authority to charge fees for access to the voter file independent of the Public Records Act, Title 2, chapter 6, MCA. The broader statutory and regulatory scheme indicates the Legislature's intent was to provide a funding mechanism for the Secretary's overhead because the agency does not receive taxpayer funding through the general fund. *See* Legislative Fiscal Division, *2025 Biennium Budget Analysis: Secretary of State* (Mont. 2023); *see also* Legislative Fiscal Division, *Memorandum Re: Funding for the Secretary of State's Office* (Mont. 2018), https://perma.cc/XDS6-U6DY (*Funding Memorandum*). The Office of the Secretary of State (Office) raises most of its funds by charging fees to businesses and corporations for filings; fees for publishing and distributing the Administrative Rules of Montana and the Montana Administrative Register; filing fees for candidates; application fees for public notaries; and occasionally through federal programs. *See generally Funding Memorandum*. Collectively, the Office's fees and appropriations are placed into an "enterprise fund," which covers the Office's overhead. Section 2-15-405(4), MCA.

¶27 Further, § 13-2-122, MCA, appears within a body of statutes generally involving voter registration and the recordkeeping system, implementing directives of the United States Congress that are intended to increase voter registration and improve the efficacy of recordkeeping systems. *See generally* Title 13, chapter 2, MCA; HAVA; NVRA. While we have not previously addressed what may comprise "actual costs" under Title 13, chapter 2, MCA, federal statutes and caselaw are instructive.

9

¶28　Although federal law likewise does not establish what "actual costs" may be charged for access to voter files, review of the public-inspection provision of the NVRA [3] provides insight into what costs are "reasonable" under federal law.  The public-inspection provision of the NVRA provides:

> Each State shall maintain for at least 2 years and shall make available *for public inspection* and, *where available, photocopying at a reasonable cost*, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1) (emphasis added).[4]  It is not clear from the language of the statute whether its directives regarding "reasonable" costs encompass more than the cost of photocopying, let alone costs associated with operating and maintaining modern voter registration software.

¶29　ACORN argues that the NVRA's directives prohibit charging the public for anything beyond the direct costs of reproducing the voter file.  Indeed, in interpreting the meaning of "actual costs" associated with reproducing voter files, other jurisdictions have ruled that ancillary or indirect costs may not be charged.  In *Schulz v. N.Y. State Bd. of Elections*, New York's Albany County Supreme Court determined that "indirect" or

---

[3] In addition to HAVA, Montana is subject to the NVRA "and its provisions for federal enforcement and oversight." *MEA-MFT v. State*, 2014 MT 33, ¶ 6, 374 Mont. 1, 318 P.3d 702.

[4] The NVRA was promulgated with "twin objectives" to remedy flagging voter participation by easing registration barriers, and to protect election integrity by maintaining accurate and current voter rolls.  *Greater Birmingham Ministries v. Sec'y of State*, 105 F.4th 1324, 1326 (11th Cir. 2024) (*GBM II*) (citing NVRA, 52 U.S.C. § 20501-20511; *Bellito v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019)).

"ancillary" costs involved in reproducing county voter files could not be charged because it could have the effect of favoring certain political groups to the disadvantage of others. 633 N.Y.S.2d 915, 922 (N.Y. Sup. Ct. 1995) ("'Actual cost' would reasonably seem to mean something more finite, direct and less inclusive than '[indirect] cost', which is a concept as infinite and expandable as the mind of man.").[5]

¶30    To be sure, Montana shares New York's interest in ensuring the public's right to "free and open elections." Mont. Const. art. II, § 13.  Like *Schulz*, the issue here bears on ballot access, given ACORN's purpose in requesting access was to investigate whether voters are being inappropriately purged from voter rolls.  The public records and freedom of information laws at issue in *Schulz*, however, were decided under New York state law, which are certainly not binding on this Court whether analogous to Montana law or not.  Moreover, it is unclear whether, in 1995, the Albany County Supreme Court would have contemplated the sophistication of software like Montana VOTES.

¶31    In an effort to frame its NVRA claim under more "modern" authority, ACORN directs us to *Greater Birmingham Ministries v. Merrill*, where the United States District Court for the Middle District of Alabama, Northern Division, ruled that the Alabama Secretary of State (secretary) implemented policies that unlawfully restricted public access to voter registration information in violation of the NVRA.  *Greater Birmingham Ministries v. Merrill*, 2022 U.S. Dist. LEXIS 181339, *18-19 (*GBM I*), *rev'd in part*,

---

[5] Additionally, the court opined that the "indirect" or "ancillary" costs might include "the cost of main-frame computers, wages of all employed in such department, and perhaps even amortization of the facilities in which the department is housed."  633 N.Y.S.2d at 921 n. 8.

11

*GBM II*. There, Greater Birmingham Ministries (GBM) sued the secretary for restricting access to data concerning felons who had been removed from Alabama's voter rolls. *GBM I*, 2022 U.S. Dist. LEXIS 181339 at *3-4. GBM alleged the secretary's fee of one cent per voter—amounting to $1,123.10—violated the NVRA because the cost was not commensurate with the cost of reproducing the data and was therefore not "reasonable." *GBM I*, 2022 U.S. Dist. LEXIS 181339 at *18. GBM indicated a willingness to pay a "reasonable cost" for the records in an electronic format, like a thumb drive. *GBM I*, 2022 U.S. Dist. LEXIS 181339 at *17. In ordering the parties to settle on a "reasonable cost," the court ruled that "whatever schedule [the secretary] develops for reasonable costs must be tethered to the actual costs he incurs in producing responsive voter records," and ordered the secretary to produce the requested data electronically. *GBM I*, 2022 U.S. Dist. LEXIS 181339 at *18. Further, the court determined that, "to the extent that Alabama law provides" fees that are not tethered to the actual costs, then "it is preempted by the NVRA." *GBM I*, 2022 U.S. Dist. LEXIS 181339 at *18-19.

¶32    The Eleventh Circuit Court of Appeals reversed, holding that the NVRA does not speak to electronic voter databases and, in fact, "'has nothing whatsoever to do with' electronic production in the first place." *GBM II*, 105 F.4th at 1335 (citing *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008)). Regarding the production of registration records, the NVRA only addresses "public inspection" and "where available, photocopying." *GBM II*, 105 F.4th at 1334 (citing 52 U.S.C. § 20507(i)(1)). The Eleventh Circuit acknowledged that the public disclosure provision of the NVRA is "an awkward fit for today's technology," but declined to "apply laws that

12

have not yet been written." *GBM II*, 105 F.4th at 1335 (citation omitted). We adopt the Eleventh Circuit's reasoning and find it wholly dispositive of ACORN's arguments concerning the NVRA, which was passed more than a decade prior to HAVA and the Secretary's implementation of Montana VOTES.

¶33 *GBM I and II* are instructive to the extent that we must ensure our public records laws accord with the NVRA; however, the cases do not resolve the "awkward" gap in the NVRA between antiquated administrative tools and sophisticated software that states use to operate and maintain voter databases today. While the Eleventh Circuit left it to the United States Congress to fill that gap, our Legislature did so when it provided the Secretary with authority to establish rules regarding the administration of fees for public records requests, and when the Secretary promulgated Admin. R. M. 44.3.1101 reflecting her interpretation of the "actual cost" of Montana VOTES.

¶34 The Secretary has charged the current fees for access to the voter file since the Office implemented Montana VOTES in 2006. ACORN does not allege nor cite record evidence indicating that the Secretary's interpretation of the law has changed, nor meaningfully stifled public access to the voter file in the two decades since. As the Secretary notes, the $1000 per-request and $5000 annual subscription fees reflect less than one percent of the $565,000 cost of operating and maintaining the voter file. The Secretary's long-standing interpretation of the law is afforded due deference because she is charged with executing her duty to establish fees in accordance with the "actual cost of the register." *D'Ewart*, 228 Mont. at 340, 742 P.2d at 1018.

¶35 The phrase "actual cost of the register, list, mailing labels, or available extracts and reports" can be interpreted in different ways and is ambiguous. Section 13-2-122(1), MCA. Obviously, charging the full cost of operating and maintaining the voter file would violate Montana law. However, the District Court correctly held in this case that the fee charged by the Secretary is consistent with state law.

¶36 The District Court did not err in ruling that the Secretary may charge fees for access to the voter file according to Admin. R. M. 44.3.1101.

¶37 *Issue Two: Did the Secretary violate the "right to know" under Article II, Section 9, of the Montana Constitution?*

¶38 ACORN argues the State violated its "right to know" when it failed to provide "documentation of what the 'actual costs' are for a yearly subscription." The State counters that it appropriately responded to ACORN's request when it simply referred ACORN to costs provided by Admin. R. M. 44.3.1101. Although ACORN raised this issue below, the District Court did not address it.

¶39 As discussed, "every person has a right to examine and obtain a copy of any public information of [Montana]." Section 2-6-1003(1), MCA; *Yellowstone Cnty.*, ¶ 17 (citation omitted). Section 13-2-122(1), MCA, ensures that the voter file is available to the public upon request. Significantly, ACORN does not lodge constitutional claims that they have been denied access to the voter file, nor do they allege the statutes or rule providing for the disputed fees violate the "right to know." ACORN's sole constitutional claim, rather, focuses narrowly on the contents of the Secretary's response to ACORN's public records request.

14

¶40 ACORN's October 27, 2021 letter and public records request to the Secretary asked for "documentation of what the 'actual costs' are for a yearly subscription so that we may be able to access it." While it is clear now that ACORN sought information tabulating the costs the Secretary's fees reflect, the issue is whether that is what ACORN actually requested.

¶41 The Secretary could have expanded its response by describing the costs underpinning administration of the voter file, as she subsequently did when ACORN requested them more specifically in discovery. ACORN's initial request, however, did not require her to do so, nor did ACORN seek clarification prior to commencing litigation. Given ACORN's request did not cite Admin. R. M. 44.3.1101, the Secretary's reference to it as a means of allowing ACORN "to access it" was reasonable.

¶42 The Secretary's response did not implicate ACORN's "right to know" under Article II, Section 9, of the Montana Constitution and it was appropriate for the District Court not to address it.

**CONCLUSION**

¶43 The District Court correctly held that the Secretary may lawfully charge fees for access to the Montana voter file pursuant to § 13-2-122(1), MCA, and Admin. R. M. 44.3.1101. Likewise, the fees do not conflict with the NVRA, and the Secretary has not violated the NVRA, because that law does not contemplate electronic filing systems like Montana VOTES. Finally, the Secretary did not violate ACORN's constitutional "right to know," because ACORN's record request did not specifically request the documents it alleges the Secretary withheld.

15

¶44   Affirmed.

                                        /S/ MIKE McGRATH

We Concur:

/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JIM RICE