FILED

12/13/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0582

DA 15-0582

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 325

CITIZENS FOR A BETTER FLATHEAD,
a Montana non-profit public benefit corporation
and SHARON DeMEESTER,

      Plaintiffs, Appellees and Cross-Appellants,

    v.

BOARD OF COUNTY COMMISSIONERS OF
FLATHEAD COUNTY, a political subdivision
of the State of Montana and the governing
body of the County of Flathead, acting by and
through James R. Dupont, Pamela Holmquist
and Dale W. Lauman,

      Defendant and Appellant.

    and

MARILYN NOONAN, RICK MYERS, ERIC WUTKE,
HUMANE SOCIETY OF NORTHWEST MONTANA,
SKYLINK FIBER COMMUNICATIONS, LLC
and JUMP INVESTMENTS,

      Intervenors Below.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                  In and For the County of Flathead, Cause No. DV-2012-010
                  Honorable David M. Ortley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Alan F. McCormick, Garlington, Lohn & Robinson, PLLP, Missoula,
            Montana

For Appellees:

Roger M. Sullivan, Ethan Welder, McGarvey, Heberling, Sullivan & Lacey, P.C., Kalispell, Montana

For Intervenors:

Noah H. Bodman, Tami E. Fisher, Fisher & Bodman, PC, Kalispell, Montana

---

Submitted on Briefs:  June 29, 2016

Decided:  December 13, 2016

Filed:

/S/ ED SMITH
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 The Board of County Commissioners of Flathead County (Commissioners or Commission) appeal from the order of the Eleventh Judicial District Court, Flathead County, granting summary judgment to Appellees and Cross-Appellants Citizens for a Better Flathead and Sharon DeMeester (collectively Citizens), who had challenged zoning actions taken by the Commission. Due to uncertainty over the scope of relief granted by the District Court's order, Citizens has cross-appealed from any partial denial of the relief it sought. We affirm in part and reverse in part.

¶2 We consider the following issues:

*1. Did the District Court err by holding that the Map Amendment was invalid for failing to comply with statutory requirements?*

*2. Did the District Court err by failing to invalidate the Text Amendment for violating statutory obligations and public participation requirements?*

*3. Did the District Court err by granting attorneys' fees to Citizens?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 Two zoning actions are at issue in this proceeding. First, by Resolution No. 955 HL, the Commission enacted an amendment to the Flathead County Zoning Regulations (FCZR) that created a new zoning classification, called the General Business Highway Greenbelt, or B-2HG. This is known as the "Text Amendment." Second, by Resolution No. 837 BX, the Commission approved an "on-the-ground" zoning change, applying the new B-2HG classification to particular property bordering Highway 93, north of Kalispell. This is known as the "Map Amendment."

3

¶4      Following the adoption of the Flathead County Growth Policy (Growth Policy)[1] in 2007, owners of property lying north of Kalispell on Highway 93 approached the Flathead County Planning and Zoning Office (Planning Office) about changing the zoning of their properties from a combination of Agricultural (AG) and Suburban Agriculture (SAG) classifications to General Business (B-2).  The Flathead County planning staff explained that such a change would not be feasible because (1) there was uncertainty regarding such changes due to the Growth Policy's lack of guidance in that area of the County; and (2) the B-2 zoning classification had substantial differences from both the AG and SAG classifications.

¶5      Several years later, in 2010, owners of property on Highway 93, north of Kalispell, proposed the creation of a mitigated commercial zone for use on major highways corridors in Flathead County.  Labeled B-2HG, this highway greenbelt category would permit many of the same uses as in B-2, General Business, but also establish conditional uses that would require approval from the Planning Office, as well as mitigation measures to alleviate the impacts between AG/SAG zoning and B-2 zoning, such as setbacks, landscaping, signage requirements, tiered building heights arising from the highway, and additional lighting restrictions to minimize light intrusions on neighboring property.  The proposed B-2HG district stated three categories of uses: (1) permitted uses (uses allowed without further review, including banks, barber shops,

---

[1] A complete copy of the Growth Policy is not included in the record on appeal.  The portion provided includes the Designated Land Uses Map, which depicts the state of zoning in Flathead County as of March 16, 2009.  The map indicates the locations of agricultural, suburban agricultural, commercial, residential, and other zoning classifications across Flathead County.

bed and breakfast operations, hotels, and food stores with less than 5,000 square feet of gross floor area); (2) conditional uses (uses that are permissible but which require a public hearing, including bars and casinos, gas stations, funeral homes, farm equipment sales, supermarkets over 5,000 square feet, and others); and (3) administrative conditional uses (uses that require county review, but do not require a public hearing, including lumber yards, day care centers, boat sales, and rental service stores and yards).

¶6 Following consultation with the Planning Office, the landowners submitted an application for adoption of the Text Amendment to amend the zoning ordinances to create the B-2HG zoning district. The landowners also submitted a request for the Map Amendment to change the zoning of their particular properties, an area covering 63 acres, to B-2HG, if the Text Amendment was first approved.

¶7 The Planning Office staff prepared a report (Text Report) on the proposed Text Amendment. Citing Montana Code and FCZR, the Text Report stated that the proposed B-2HG classification would advance three parts of the Growth Policy: (1) "Provide ample commercial land designation to promote affordability" (Policy 6.3); (2) "Encourage small-scale, impact-mitigated and compatible commercial developments in accessible, developing rural areas with good access and away from urban areas" (Policy 7.3); and (3) "Identify existing areas that are suitable for impact-mitigated commercial uses" (Policy 7.4). The Text Report also addressed the statutory considerations required by § 76-2-203, MCA, including fire dangers; promotion of health, public safety, and general welfare; facilitating adequate provision of transportation, water, sewer, schools, parks, and other public requirements; compatibility

with urban growth in the area; the character of the district and its peculiar suitability for particular uses; and whether the proposed Text Amendment would be compatible with ordinances of the surrounding municipalities.

¶8 Specifically, the Text Report stated that Flathead County did not have a "building department" like the cities of Whitefish and Kalispell, but that the proposed amendment contained "additional criteria for the site development similar to criteria used by the cities" and gave consideration to the growth of nearby municipalities "because the text of the proposed amendment provides for standards that are similar to neighboring municipality's standards for highway commercial standards." The Text Report noted that although this particular zoning ordinance did not exist in area municipalities, similar municipal ordinances had been consulted for guidance, and that "[p]ortions of the proposed amendment were based upon regulations adopted by local municipalities."

¶9 After notice, the Commission conducted a public hearing on May 17, 2011. Proponents and opponents of the Text Amendment offered public comment, after which Commissioner Holmquist stated she would take the comments under consideration. Commissioner Lauman said that "issues expressed . . . need [to be] addressed" and stated a "concern regarding which public roads would be affected." Chairman Dupont asked the Planning Board to address the concerns raised.

¶10 On May 31, 2011, the Commissioners met to discuss changes to the proposed Text Amendment. Public comment was again taken and six citizens spoke in opposition. The Commissioners discussed potential locations where the B-2HG zone could be applied, but clarified that adopting the Text Amendment would not automatically zone any piece

6

of property, but only provide another "tool in the toolbox" for zoning. The Commissioners adopted changes to the Text Amendment that had been suggested in the multiple public workshops conducted by the Planning Board, and published notice of their intent to adopt the Text Amendment as amended.

¶11 On July 27, 2011, the Commission held its final hearing regarding the Text Amendment. It was reported that, during the statutory protest period, 881 protests to the Text Amendment were received, which was insufficient to legally block its adoption. Commissioner Holmquist said that she had read through all the protest letters, indicating that they included "inaccurate and scare tactic information" and that the "B2HG is not replacing B2 zoning, and it does not cover every road in the county; it is only on major arterial roads." Commissioner Lauman said he "spent a lot of time" reading through the protests and petitions received, and expressed "concerns about the quality of information put out there [regarding the B-2HG Text Amendment]." He stated that he did "not see where B2HG zoning would impose anything on anyone that they can't already do." Chairman Dupont concurred, noting that "if [the B-2HG Text Amendment] passed today it would be an option for zoning that a property owner can choose from to further restrict development of their property." The Commission unanimously adopted the Text Amendment.

¶12 On August 7, 2011, the landowners requested that their proposed Map Amendment be adopted by the Commission, which would change the zoning of their property from SAG to the newly created B-2HG zone. The Planning Office's report (Map Report) analyzed whether the Map Amendment substantially complied with the

Growth Policy and met the requirements of § 76-2-203, MCA. The Map Report noted six policies in the Growth Policy that "may be relevant": (1) "Provide ample commercial land designation to promote affordability" (Policy 6.3); (2) "Require traffic impact analysis for all major commercial projects on major highways and arterials" (Policy 6.4); (3) "Conserve resources and minimize transportation demand by encouraging redevelopment and infill of existing commercial areas" (Policy 6.5); (4) "Encourage small-scale, impact-mitigated and compatible commercial developments in accessible, developing rural areas with good access and away from urban areas" (Policy 7.3); (5) "Identify existing areas that are suitable for impact-mitigated commercial uses" (Policy 7.4); and (6) "Encourage commercial development that is visually and functionally desirable" (Policy 7.5). The Map Report generally concluded that these policies would be furthered by zoning the land in question as B-2HG, but noted that the proposed zoning change would not provide infill. The Map Report also noted two problems that required "careful Planning Board and Commission consideration": (1) the lack of specific guidance regarding the Highway 93 area, because there was no neighborhood plan or future use map; and (2) the potential lack of compatible growth with nearby municipalities. The Planning Board voted to approve the Map Amendment. After review, the Commission made several changes to the Map Amendment and unanimously adopted it on February 14, 2012.

¶13 Citizens initiated this action, challenging the Commission's adoption of both the Text Amendment and the Map Amendment. Both sides moved for summary judgment. The District Court held that "the map amendments along with the zone change on the

8

land in question are voided" for failing to substantially comply with the Flathead County Growth Policy; that the Commissioners' actions in rezoning the 63 acres constituted illegal spot zoning; and that Citizens were entitled to an award of attorney fees and costs.

## STANDARDS OF REVIEW

¶14   We review a district court's grant of summary judgment de novo, applying the same criteria as the district court. *Siebken v. Voderberg*, 2012 MT 291, ¶ 16, 367 Mont. 344, 291 P.3d 572; *N. 93 Neighbors, Inc. v. Bd. of Cnty. Comm'rs*, 2006 MT 132, ¶ 17, 332 Mont. 327, 137 P.3d 557.  A de novo review is one that is "anew" from beginning to end. *White Sulphur Springs v. Voise*, 136 Mont. 1, 5, 343 P.2d 855, 857 (1959).

¶15   Amendment of a zoning designation constitutes a legislative act.  Section 7-1-104, MCA; *Schanz v. City of Billings*, 182 Mont. 328, 335, 597 P.2d 67, 71 (1979); *N. 93 Neighbors*, ¶ 18; *Lake County First v. Polson City Council*, 2009 MT 322, ¶ 37, 352 Mont. 489, 218 P.3d 816.  We presume legislative acts are valid and reasonable, *Lake County First*, ¶ 37; *Schanz*, 182 Mont. at 335, 597 P.2d at 71, and review only for an abuse of discretion.  *N. 93 Neighbors*, ¶ 18; *Lake County First*, ¶ 37.  A district court abuses its discretion if it acted "arbitrarily without the employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice."  *State v. Sage*, 2010 MT 156, ¶ 21, 357 Mont. 99, 235 P.3d 1284.  A district court may also abuse its discretion if it bases its decision on information "so lacking in fact and foundation that it is clearly unreasonable."  *Lake County First*, ¶ 34 (internal quotations omitted) (citing *N. 93 Neighbors*, ¶ 44; *Schanz*, 182 Mont. at 335–36, 597 P.2d at 71).

9

## DISCUSSION

¶16    *1. Did the District Court err by holding that the Map Amendment was invalid for failing to comply with statutory requirements?*

¶17    The Commission argues that the District Court's determination that the Map Amendment failed to substantially comply with the County's Growth Policy was based upon factual errors, incorrect legal conclusions, and a failure to consider whether the Commission's decision was supported with an adequate record and analysis.   Citizens answer that the record "unequivocally demonstrates" that the Commission failed to even consider, let alone "be guided by," important elements of the Growth Policy.

¶18    When adopting zoning regulations, "the board of county commissioners *shall consider*":

> (a) reasonable provision of adequate light and air; (b) the effect on motorized and nonmotorized transportation systems; (c) compatible urban growth in the vicinity of cities and towns that at a minimum must include the areas around municipalities; (d) the character of the district and its peculiar suitability for particular uses; and (e) conserving the value of buildings and encouraging the most appropriate use of land throughout the jurisdictional area.

Section 76-2-203(2), MCA (emphasis added).   In addition to "considering" the "compatible urban growth in the vicinity of cities and towns," § 76-2-203(2)(c), MCA, any zoning adopted by the county "must, as nearly as possible, be made compatible with the zoning ordinances of nearby municipalities."  Section 76-2-203(3), MCA.

¶19    County zoning regulations must also be "made in accordance with the growth policy."  Section 76-2-203(1)(a), MCA; *see also* § 76-1-605(1), MCA (governing bodies "must be guided by and give consideration to the general policy and pattern of

10

development set out in the growth policy" when adopting zoning ordinances or resolutions). However, a growth policy "is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law," nor may a governing body "withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy." Section 76-1-605(2), MCA. We have explained that these statutes, in sum, require zoning to be in "substantial compliance" with the growth policy. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 79, 360 Mont. 207, 255 P.3d 80; *Citizen Advocates for a Livable Missoula, Inc. v. City Council*, 2006 MT 47, ¶ 23, 331 Mont. 269, 130 P.3d 1259; *Ash Grove Cement Co. v. Jefferson Cnty.*, 283 Mont. 486, 495-96, 943 P.2d 85, 91 (1997); *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 256, ¶¶ 25-31, ___ Mont. ___, ___ P.3d ___ (finding numerous public meetings and no inhibition of public comment, though in only one primary city, did not create "substantial non-compliance with the growth policy" requirement that meetings must be held "throughout Flathead County").

¶20 "Substantial compliance" does not mean that zoning must be "consistent with every goal and objective expressed in the growth plan documents," because this would mean "strict" or "rigid" compliance, as with a regulatory requirement. *Heffernan*, ¶ 78 (citing *Citizen Advocates for a Livable Missoula, Inc.*, ¶ 30); *Little v. Bd. of Cnty. Comm'rs*, 193 Mont. 334, 353, 631 P.2d 1282, 1293 (1981) ("To require strict compliance with the master plan would result in a master plan so unworkable that it would have to be constantly changed to comply with the realities. The master plan is,

11

after all, a plan."). "All facets of the proposed land use must be considered to determine whether, taken together, they comply not strictly, but substantially with the goals, objectives, and recommendations in the growth policy." *Heffernan*, ¶ 78 (emphasis omitted). A governing body "must develop a record that fleshes out all pertinent facts upon which its decision was based in order to facilitate judicial review. For purposes of evaluating 'substantial compliance,' that includes all pertinent elements of the growth policy." *Heffernan*, ¶ 87 (internal citations omitted).

¶21 In *Heffernan*, we held that the Missoula City Council had insufficiently evaluated the pertinent elements of the growth policy when approving a zoning change. There, the Missoula City Council had "simply not addressed" or "addressed but in conclusory fashion" many of the goals and recommendations from the growth policy at issue. *Heffernan*, ¶ 85. We reach similar conclusions here regarding the Growth Policy at issue.

¶22 The Planning Office's Map Report indicated that six out of fifty policies in the Growth Policy may be relevant to the proposed Map Amendment. Largely missing from the Map Report, and from the Commission's analysis, was a consideration of possible conflicts between the proposed B-2HG zoning and the Growth Policy, and other pertinent factors raised by the Growth Policy.

¶23 First, the Map Report stated that Policy 6.3—"Provide ample commercial land designation to promote affordability"—was furthered by zoning this area B-2HG because "[h]ighway corridors provide opportunities for relatively inexpensive land in areas of high accessibility and visibility." However, this general statement overlooked the

potential conflict posed by the proposed zoning change in this subject area, as raised by the commentary to Chapter 2 of the Growth Policy, addressing strip developments:

> All but one of the seven elements of the public's vision for the future of the county outlined in Chapter 1 are directly impacted by the manner in which commercial land is developed. *County residents regularly comment on the need to prevent "strip development" from dominating the rural landscape between business centers. . . . It is not a common remark that no development should take place, just that a certain type of development should be avoided.*

(Emphasis added.) As noted by the District Court, this issue was raised by the planning staff of both Kalispell and Whitefish, expressing concern that the amendment "will allow strip development to expand beyond the already existing strip development, contrary to the long range planning for both Kalispell and Whitefish." While the Map Report noted that the B-2HG zone would "utilize[] standards for the site development similar to standards used by the cities to mitigate impacts of strip development," consideration was not given to whether re-zoning this property along the highway would either limit or enhance the kind of development disfavored by the Growth Policy. Although this concern, by itself, may be insufficient to invalidate the Map Amendment, *see Heffernan*, ¶ 78, this issue, identified by the Growth Policy as an important development concern, was not properly considered.

¶24 Second, traffic considerations were only cursorily addressed. The Commission identified one policy that required traffic impact analysis for major commercial developments, and noted that the conditional uses in B-2HG zoning would require such an analysis. However, Chapter 6 of the Growth Policy provides many more traffic considerations. The policies encourage, among other goals, "[l]imit[ing] private

13

driveways from directly accessing arterials and collector roads," "[p]romot[ing] coordinated and cooperative transportation planning with Kalispell, Columbia Falls, Whitefish and Montana Departments of Transportation and the Department of Natural Resources and Conservation," and "[r]estrict[ing] direct access from private properties onto the Montana State highways." There is no evidence indicating that Flathead County consulted the Montana Department of Transportation for guidance on development along Highway 93, and the Map Amendment analysis did not address how the newly allowed uses, such as banks, food stores, hotels, churches, etc.—not conditional uses—would impact traffic as the property directly abutting Highway 93 was developed. These goals concerning a critical object of planning—traffic and traffic safety—were not properly considered.

¶25 Further, little attention was given to the requirement that the County consider "compatible urban growth in the vicinity of cities and towns," § 76-2-203(2)(c), MCA, and that county zoning "must, as nearly as possible, be made compatible with the zoning ordinances of nearby municipalities." Section 76-2-203(3), MCA. Flathead County's Designated Land Uses Map designated the area of the proposed Map Amendment as SAG. While the parties dispute the Designated Land Uses Map's authority and significance, it was nonetheless consistent with Kalispell's Growth Policy, which similarly designated the same area as Suburban Residential. Kalispell's interest in this area was heightened because, as the District Court stated, "[t]he land under question is across from and immediately north of land which has already been annexed into Kalispell, so it is very reasonable to assume that Kalispell will grow in that direction and

14

annex this land." The Map Report noted this and explained that "the proposed map amendment is not compatible with the City of Kalispell's planning for the subject properties. If the proposed map amendment was approved and then the properties petitioned to annex into the city, the zoning would not be in compliance with [Kalispell's] Growth Policy." The Map Report offered that consideration had been given to Kalispell's Growth Policy and to compatible urban growth because "some standards for site development similar in nature to mechanisms in use by the City of Kalispell" would be employed in the new zone. However, citation to similar site development standards does not contemplate the larger issue that the County's new zone may result in development that is inconsistent with planned and potentially imminent Kalispell growth. We recognize that § 76-2-203(3), MCA, requires only that county zoning be "compatible with zoning *Ordinances* of nearby municipalities," not city growth policies. (Emphasis added.) Further, the County's argument that the District Court erred by holding that "the map amendment and zone must *statutorily comply* with existing municipal zoning" is well taken. (Emphasis added.) The District Court here erroneously overstated the obligation of the County, and Kalispell does not exercise a "veto power" over the County's zoning. However, in view of clear conflict between the proposed Map Amendment and the stated growth purposes expressed in Kalispell's growth plan for property that was immediately adjacent to the city, it was incumbent on the County to more broadly consider this issue and assess the impact of the proposed Map Amendment on Kalispell's growth plans. As Citizens' briefing states, "[w]hile some tension [between county zoning and city planning] is perhaps inevitable, open conflict is unnecessary."

15

¶26　The proposed application of the B-2HG zone to the 63 acres in question, directly abutting a Montana State highway, would have permitted banks, retail shops, and other businesses along the highway, clearly impacting traffic, posing a potential for further strip development, and potentially conflicting with planned growth in close proximity to Kalispell. However, the County's consideration only cursorily addressed commercial growth goals in the Growth Policy, did not address potential conflicts over disfavored development, only briefly addressed traffic and traffic safety concerns, and failed to assess the possible conflict with planned city growth. While the County does not need to address every aspect of the Growth Policy in detail, it must give sufficient consideration to the policies that raise pertinent and significant concerns. For these reasons, we conclude the Commission abused its discretion in implementing the Map Amendment. We do not reach the issues of whether the Map Amendment constituted spot zoning or was enacted in violation of public participation requirements. We affirm the District Court's ruling invalidating the Map Amendment.

¶27　*2. Did the District Court err by failing to invalidate the Text Amendment for violating statutory obligations and public participation requirements?*

¶28　As an initial matter, Citizens and Commissioners dispute the scope of the District Court's order and the relief granted. Commissioners argue that the District Court's "ruling voided only the Commissioners' map amendment." Acknowledging the possibility of this interpretation of the District Court's order, Citizens cross-appealed to preserve its challenge to the Text Amendment, arguing that "[i]nherent in the District

16

Court's decision is its grant of Citizens requested relief, overturning <u>both</u> the map and text amendments." (Emphasis in original.)

¶29 The Commissioners clearly took two separate zoning actions, passing two different zoning resolutions. Citizens challenged both actions, and the parties briefed both actions before the District Court. In its order, the District Court began its analysis by stating that Citizens requested both zoning actions be declared void, but added "the Court will focus primarily on the map amendment and zone change and the errors and deficiencies therein." The District Court then engaged in several legal analyses, concluding each time that only the Map Amendment and the associated zone change on the subject property were void, commonly employing such language: "It is clear the Commissioners decision to re-zone *the land* is unsustainable. Clearly, the map amendment and zone change *for the land in question* does not comply with the growth policy, constitutes spot zoning, was an abuse of discretion and must be voided." (Emphasis added.) Then, in the "ORDER" section of its decision, the District Court stated:

> Plaintiffs' Motion for Summary Judgment that the act of the Commissioners of Flathead County was an abuse of discretion is granted and the map amendments along with the zone change imposed on the land in question are voided.

Here, the reference to actions for which relief is granted is singular ("Plaintiffs' Motion for Summary Judgment that *the act* of the Commissioners . . . is granted" (emphasis added)) and, in that regard, the order mentions only the Map Amendment and the corresponding zone change "on the land," not the Text Amendment.

17

¶30 The District Court made two statements that could implicate the Text Amendment. In what seems to be a passing observation, the District Court stated that the Text Amendment's "lack of comprehensive consideration [of neighborhood plans which encompass a major transportation corridor] is contrary to the Growth Policy which places great importance on existing neighborhood plans." By itself, this is insufficient to invalidate the Text Amendment, absent a determination that the Text Amendment was not in "substantial compliance" with the County's Growth Policy. *Heffernan*, ¶ 79. Then, near the beginning of its order, the District Court stated that "[t]he result of the County adopting the text, map and zone amendments which are inconsistent with other controlling documents is that the Commissioners' acts were an abuse of discretion." This statement immediately follows a recitation of Citizens' argument on this issue and precedes any analysis by the District Court. That particular section of the order concludes that only the Map Amendment was flawed. A review of the entire section yields ambiguity about the District Court's intention with regard to the Text Amendment.

¶31 It is, at least, poor procedure for a legislative act to be judicially invalidated by way of an order that is ambiguous as to that intent. Further, because, as discussed herein, the proper standards were not applied by the District Court to determine the Text Amendment's validity, we conclude that the District Court's order was not sufficient to invalidate the Text Amendment in addition to the Map Amendment. However, because the issue was raised and briefed in the District Court, and because Citizens has cross-appealed any denial of its challenge to the Text Amendment, we undertake review of its validity. *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶¶ 28–29, 330 Mont. 282,

18

127 P.3d 436 (undertaking review of arguments not ruled on by the district court based on summary judgment standard of review); *Chapman v. Maxwell*, 2014 MT 35, ¶ 12, 374 Mont. 12, 322 P.3d 1029 ("Our de novo standard of review of summary judgment decisions allows us to review the record and make our own determinations regarding the existence of disputed issues of fact and entitlement to judgment as a matter of law.").

***Text Amendments Generally***

¶32    Although our jurisprudence includes many cases involving zoning changes made "on the ground" through map amendments,[2] planned unit developments,[3] and other methods,[4] we have not previously addressed the legal standards applicable to enactment of a "text amendment," as referred to by the parties here, that makes no actual zoning changes on the ground.  However, there is a significant, nationwide body of law regarding such enactments, a type of zoning commonly referred to as "floating zones." We here assess this national jurisprudence and its application in Montana law.

¶33    "Unlike traditional zoning by mapped districts, a floating zone establishes a use classification in the zoning ordinance when adopted by a legislative body but the classification is not delineated on the zoning map until after a rezoning process initiated by a property owner."  3 Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 45:1, at 45-2 (2016) [hereinafter *The Law of Zoning and*

---

[2] *E.g.*, *Little*, 193 Mont. at 336-39, 631 P.2d at 1284-85 (map amendment from unzoned to commercial); *Heffernan*, ¶¶ 15-17 (map amendment to allow higher density residential).

[3] *E.g.*, *Bridger Canyon Prop. Owners' Ass'n v. Planning & Zoning Comm'n*, 270 Mont. 160, 162, 890 P.2d 1268, 1269 (1995) (planned unit development with six zoning changes).

[4] *E.g.*, *Citizen Advocates for a Livable Missoula, Inc.*, ¶¶ 7-8 (creation of a special district, which amends the text and applies the zoning on a specific location, so both a combined text and map amendment); *Helena Sand & Gravel Inc. v. Lewis & Clark Cnty. Planning & Zoning Comm'n*, 2012 MT 272, ¶ 7, 367 Mont. 130, 290 P.3d 691 (creation of a special district).

*Planning*]; *accord* Kristine Cordier Karnezis, Annotation, *Zoning: Regulations Creating and Placing "Floating Zones"*, 80 A.L.R.3d 95, § 1a (2016); 2 Patrick H. Rohan & Eric Damian Kelly, *Zoning and Land Use Controls* § 13.01, at 13-3 (2016); 1 Patricia E. Salkin, *American Law of Zoning* § 9:80 (5th ed. 2016); Daniel R. Mandelker, *Land Use Law* § 6:63 (4th ed. 1997); *Bellemeade Co. v. Priddle*, 503 S.W.2d 734, 738 (Ky. 1973); *Bigenho v. Montgomery Cnty. Council*, 237 A.2d 53, 56-57 (Md. 1968); *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 120 A.3d 677, 691-93 (Md. 2015) [hereinafter *Prince George's Cnty.*]; *Campion v. Bd. of Aldermen of the City of New Haven*, 899 A.2d 542, 552-54 (Conn. 2006) (citing *Sheridan v. Planning Bd. of the City of Stamford*, 266 A.2d 396, 404-05 (Conn. 1969)).

¶34    Floating zones are implemented through a two-step process. Karnezis, *supra*, § 3. First, the "local zoning authority establishes in its zoning ordinance a specific zoning classification for a specific purpose or a class of purposes, but does not assign on the zoning map the classification to any property." *Prince George's Cnty.*, 120 A.3d at 692; *accord Zoning and Land Use Controls*, *supra*, § 13.01, at 13-3. After enacted by the local municipality, this zone is said to "float" above the jurisdiction until a request is made for the zone to be applied to a particular piece of property. *Bellemeade Co.*, 503 S.W.2d at 738; *Bigenho*, 237 A.2d at 56. The second step occurs when a landowner requests rezoning (a map amendment) to apply the floating zone to his or her property. *Prince George's Cnty.*, 120 A.3d at 692; Karnezis, *supra*, § 3. Then, the governing body "considers the recommendation of the zoning agency, holds a public hearing, and either approves or rejects the developer's rezoning request." *The Law of Zoning and Planning*,

*supra*, § 45:2, at 45-6 to 45-7; *accord Zoning and Land Use Controls*, *supra*, § 13.02, at 13-8; *Prince George's Cnty.*, 120 A.3d at 692 ("To rezone a property to a floating zone, the zoning authority must find generally that the legislative prerequisites for the zone are met and the rezoning is compatible with the surrounding neighborhood."). This two-step process was followed by Flathead County in this case.[5]

¶35    Float zoning was developed in response to "Euclidian zoning" permitted by the United States Supreme Court in *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114 (1926). *The Law of Zoning and Planning*, *supra*, § 45:1, at 45-2. Euclidian zoning "(1) divides a municipality into specific zones or districts; (2) assigns the uses of land within the districts, excluding certain uses from certain districts; and (3) establishes height, width, setback, and other measurement or structural restrictions applicable within each district." *Zoning and Land Use Controls*, *supra*, § 13.01, at 13-2 to 13-3. The purpose of float zoning is to provide more flexibility in municipal zoning. *Zoning and Land Use Controls*, *supra*, § 13.01, at 13-3 to 13-4 (noting the use of floating zones "where new or specialized uses are contemplated but cannot be specifically located at the time the districts are originally drawn"); *The Law of Zoning and Planning*, § 45:1, at 45-3; *Prince George's Cnty.*, 120 A.3d at 691 ("Floating zones . . . are a local legislative response to the relative rigidity of Euclidian zoning and occupy the opposite end of the

_____

[5] Another definition of float zoning is "a two-step zoning technique whereby a municipality first creates a particular use district in its zoning regulations so that the zone is said to 'float' over the entire municipality until at some future time, in a second step, the municipality amends its zoning regulations and map to locate, or 'settle,' the zone on a particular parcel of land. The first step makes the floating zone available and the second step places it on the land by a rezoning action, ordinarily at the request of an individual property owner." Karnezis, *supra*, § 1a.

flexibility continuum of zoning categories from Euclidian zones."); *Zoning and Land Use Controls*, *supra*, § 13.01, at 13-5 ("One of the most logical uses for a floating zone is to create the predictability of a set of written rules for a type of development that does not yet exist in the community without tying that development to a specific site."); *American Law of Zoning*, § 9:80, at 9-255 ("The floating zone is widely employed to create cluster developments, planned developments of various kinds, and planned unit developments." (internal footnotes omitted)).

¶36    Although it did not use the phrase "floating zone," the New York Court of Appeals was the first court to address that concept, in *Rodgers v. Village of Tarrytown*, 96 N.E.2d 731 (N.Y. 1951). The Village of Tarrytown enacted two, separate zoning ordinances. First, in 1947, Tarrytown enacted an ordinance that created "[a] new district or class of zone to be called 'Residence B-B,'" but provided no boundaries for where the zone would apply. *Rodgers*, 96 N.E.2d at 732 (internal punctuation omitted). Rather, it stated that boundaries would be "fixed by amendment of the official village building zone map, at such times in the future as such district or class of zone is applied, to properties in this village." *Rodgers*, 96 N.E.2d at 732. The ordinance also contained standards required in the new zoning classification pertaining to lot size, building height, setbacks, and other specifications. *Rodgers*, 96 N.E.2d at 732-33. Then, in 1948, a landowner approached the Village seeking to rezone her land to the Residence B-B zoning category created the year prior. *Rodgers*, 96 N.E.2d at 733. The Village approved the map amendment and another landowner brought suit challenging both ordinances. *Rodgers*, 96 N.E.2d at 733.

¶37    The Court of Appeals first addressed the map amendment ordinance that rezoned the land to the new Residence B-B zoning category, holding that this "on the ground" rezoning was within the municipality's authority and that the action furthered the municipality's zoning, explaining:

> The mere circumstance that an owner possesses a ten-acre plot and submits plans conforming to the physical requirements prescribed by the 1947 amendment will not entitle him, *ipso facto*, to a Residence B-B classification.  It will still be for the board to decide, in the exercise of a reasonable discretion, that the *grant* of such a classification accords with the comprehensive zoning plan and benefits the village as a whole.

*Rodgers*, 96 N.E.2d at 734 (emphasis original).  This holding was, in essence, a review to ensure the map amendment complied with what today is considered a comprehensive plan or growth policy.  Secondly, the Court of Appeals addressed the initial text amendment ordinance, which had created the new zoning classification but had not applied it to any particular property in the jurisdiction.  On that point it held:

> We turn finally to the contention that the 1947 ordinance is invalid because, in proclaiming a Residence B-B district, it set no boundaries for the new district and made no changes on the building zone map. The short answer is that, since the ordinance merely prescribed specifications for a new use district, there was no need for it to do either the one or the other. True, until boundaries are fixed and until zoning map changes are made, no new zone actually comes into being, and neither property nor the rights of any property owner are affected. But it was not the design of the board of trustees by that enactment to bring any additional zone into being or to affect any property or rights; the ordinance merely provided the mechanics pursuant to which property owners might in the future apply for the redistricting of their property. In sum, the 1947 amendment was merely the first step in a reasoned plan of rezoning, and specifically provided for further action on the part of the board.

*Rodgers*, 96 N.E.2d at 735-36.

23

¶38 Since *Rodgers v. Village of Tarrytown*, many states have addressed float zoning and have generally found it to be a legally valid and appropriate means of zoning. *Zoning and Land Use Controls*, *supra*, § 13.05 (noting New York, Maryland, Connecticut, Kentucky, California, Indiana, Michigan, Missouri, New Hampshire, Rhode Island, and Wisconsin); *The Law of Zoning and Planning*, *supra*, § 45:5 (adding Colorado, Delaware, Idaho, Massachusetts, Pennsylvania, and Washington).[6]

¶39 In the case before us, the Commissioners took two, separate actions. First, they enacted a zoning regulation that created the B-2HG zoning classification within the FCZR, containing certain specifics regarding location, lot size, use, setback, building height, and others. This Text Amendment made no actual changes "on the ground" to any property, or to the zoning map. Rather, it was, in the words of the Commissioners, another "tool in the [zoning] toolbox." Second, the Commissioners enacted a second ordinance that applied the new B-2HG zoning category to the property of the petitioners and to the zoning map. The first action, the Text Amendment, created a classic floating zone, and the second action, the Map Amendment, applied that floating zone to the map. As we have already determined, the Map Amendment was adopted in violation of the County's statutory zoning obligations.

---

[6] Float zoning has been disapproved only in a couple of court cases, *see Rockhill v. Twp. of Chesterfield*, 128 A.2d 473 (N.J. 1973); *Eves v. Zoning Bd. of Adjustment*, 164 A.2d 7 (Pa. 1960) (no longer controlling law in Pennsylvania, *see Russell v. Penn. Twp. Planning Comm'n*, 348 A.2d 499 (1975)), but those decisions "failed to influence later court decisions in other jurisdictions. State Court decisions that have ruled on the issue generally have approved of the floating zone device." *The Law of Zoning and Planning*, *supra*, § 45:6, at 45-17 to 45-20.

¶40 Turning to Montana law, our state's zoning statutes generally provide for flexibility in zoning and readily encompass a county's enactment of a floating zone, as Flathead County enacted here. Section 76-2-203, MCA, provides the substantive requirements for all zoning regulations enacted by a county, without distinguishing between text and map amendments. These provisions do not prohibit float zoning or otherwise require all zoning ordinances to apply to a particular property or location when enacted. Rather, the statutes require certain considerations and analyses to be undertaken, §§ 76-2-203(1)(b), (2), (3), MCA, and that zoning regulations be in accordance with the county's growth policy. Section 76-2-203(1)(a), MCA. Procedurally, the same process is statutorily required for "the establishment or revision of boundaries for zoning districts and in the adoption or amendment of zoning regulations"—a broad description of the possible zoning actions that may be undertaken by a board of county commissioners. Section 76-2-205, MCA.

¶41 Additionally, floating zones are typically the method of implementation of a planned unit development (PUD). *American Law of Zoning*, § 9:80, at 9-255 ("The floating zone is widely employed to create . . . planned unit developments."); *Zoning and Land Use Controls*, § 13.01, at 13-4 ("Most planned unit development . . . zones 'float' over the zoning map in the sense that it is rare to see a site pre-zoned for planned unit development without some sort of development plan attached to it."). Localities in Montana routinely use PUDs in their zoning. *See e.g., Kent v. City of Columbia Falls*, 2015 MT 139, ¶ 3, 379 Mont. 190, 350 P.3d 9; *Botz v. Bridger Canyon Planning & Zoning Comm'n*, 2012 MT 262, ¶ 6, 367 Mont. 47, 289 P.3d 180; *Grant Creek Heights,*

*Inc. v. Missoula Cnty.*, 2012 MT 177, ¶ 5, 366 Mont. 44, 285 P.3d 1046. "[P]lanned unit developments, like zoning amendments and variances, are normal land use regulation tools, their approvals are matters committed to the judgment of local officials, and they are used to further the welfare of the general public." *Kent*, ¶ 68 (Baker, J., dissenting).

***Judicial Review of Text Amendments/Floating Zones***

¶42    Generally, floating zones are given legislative deference and presumed valid. *Zoning and Land Use Controls*, *supra*, § 13.04, at 13-22 to 13-23; *The Law of Zoning and Planning*, *supra*, § 45:7, at 45-21. Likewise, legislative deference is given to municipal zoning actions under Montana law, and this Court only reviews for an abuse of discretion. *Schanz*, 182 Mont. at 335, 597 P.2d at 71 ("[A] zoning ordinance is a legislative enactment, and is entitled to the presumption of validity and reasonableness." (original punctuation omitted)); *N. 93 Neighbors*, ¶ 18; *Lake County First*, ¶ 37.

¶43    However, zoning regulations, including text amendments or float zoning, must comply with governing statutes. Where a state has a requirement that all zoning regulations comply with the comprehensive plan, the floating zone must comply with that comprehensive plan. *Zoning and Land Use Controls*, *supra*, § 13.02, at 13-8 to 13-9; Karnezis, *supra*, § 5a; *Rockville Crushed Stone, Inc. v. Montgomery Cnty.*, 552 A.2d 960, 970 (Md. 1988) (affirming a district court's ruling that struck down application of a floating zone to an area for violating the comprehensive plan); *Wheaton Moose Lodge No. 1775 v. Montgomery Cnty.*, 397 A.2d 250, 261-62 (Md. Ct. Spec. App. 1979) (affirming a district court's ruling that denied designation of a floating zone to property in part because of incompatibility with the local comprehensive plan); *Prince George's*

26

*Cnty.*, 120 A.3d at 692; *Lutz v. City of Longview*, 520 P.2d 1374, 1379 (Wash. 1974) (holding floating zone as applied on the ground did not conflict with the comprehensive plan). Similarly, all zoning regulations in Montana, which would include floating zones, must comply with statutory requirements. Sections 76-2-203, 76-1-605, MCA.

¶44 While a text amendment or floating zone must likewise "substantially comply" with a growth policy, *Heffernan*, ¶ 79, and all other statutory requirements, the nature of a legal review of its validity is starkly different than for a map amendment, because no changes are made to actual property or to a location on a zoning map. Consequently, there is no specific factual context to evaluate whether a new zoning category, before applied to a particular location, substantially complies with the growth policy or is compatible with the zoning ordinances of "nearby municipalities." These issues necessarily require a consideration of location. If a new commercial zoning category was proposed for an area that had a neighborhood plan calling for no further business development, the proposed category would, of course, fail to substantially comply. On the other hand, if a new commercial category was proposed for an area slated for business growth under the growth policy, it could very well substantially comply. The location is what permits this analysis to be undertaken.

¶45 The difference between challenging a text amendment and challenging a map amendment is analogous to the difference between a facial and as-applied challenge to a statute. *See State v. Whalen*, 2013 MT 26, ¶¶ 20-22, 368 Mont. 354, 295 P.3d 1055; *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131. One examines the application of a statute as applied in the given set of circumstances (as

applied), while the other reviews the possible application of the statute in all circumstances (facial). *Brady v. PPL Mont., Inc.*, 2008 MT 177, ¶ 13, 343 Mont. 405, 185 P.3d 330 (Gray, C.J., dissenting) ("Facial challenges, unlike as applied challenges, do not depend on the facts of a particular case."); *In re Marriage of K.E.V.*, 267 Mont. 323, 336, 883 P.2d 1246, 1255 (1994) (Trieweiler, J., concurring and dissenting) ("*The difference is important.* If a court holds a statute unconstitutional on its face, the state may not enforce it under any circumstances, unless an appropriate court narrows its application; in contrast, when a court holds a statute unconstitutional as applied to particular facts, the state may enforce the statute in different circumstances." (emphasis in original)). Facial challenges require the litigant to show "no set of circumstances exists" where the statute would be valid, "i.e., that the law is unconstitutional in all its applications." *Mont. Cannabis Indus. Ass'n*, ¶ 14 (internal quotations omitted) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008).

¶46    Thus, in a legal challenge to a county text amendment or floating zone that makes no "on the ground" changes, the question is whether the new zoning category could satisfy statutory requirements *anywhere in the county*. Put another way, to invalidate an ordinance enacting only a text amendment, a court must conclude there is no place within the jurisdiction where the amendment could be implemented without violating statutory requirements.

¶47    Subsequently, when a map amendment is considered, the county would, of course, conduct the second review—based on the proposed location—to determine whether the

28

proposed zoning satisfied statutory requirements. A challenge to an approved map amendment is akin to an as-applied challenge of the zoning. Further, this is the stage where it is possible to evaluate whether the zoning constitutes spot zoning.[7]

***Citizens' Challenges to the Text Amendment***

¶48 Citizens challenged the Text Amendment on the grounds that it (1) failed to substantially comply with the County Growth Policy, and violated other statutory obligations, and (2) that the Commissioners failed to satisfy public participation requirements.

¶49 The Text Amendment implemented by Flathead County made no actual zoning map changes in Flathead County. It created the possibility that property in Flathead County could be zoned to B-2HG if regulatory requirements were satisfied and the Growth Policy was substantially complied with in the location of its application. Facially, the B-2HG zone could appropriately be implemented in Flathead County if, for example, a landowner wished to change the zoning of his or her property from less restrictive to more restrictive by moving from B-2 to B-2HG. At a minimum, areas in Flathead County already zoned for commercial or business could be rezoned to B-2HG without violating the Growth Policy, as that would change those properties to a more restrictive zoning than currently zoned. The Designated Land Uses Map from the Growth Policy indicates the existence of such areas. We need not take this analysis

---

[7] Because a text amendment does not change the zoning on a particular piece of land, it cannot constitute spot zoning. As we held in *Little*, the factors focus on the "area," where the "use is to apply," and the number of landowners actually affected. *Little*, 193 Mont. at 346, 631 P.2d at 1289. Because the analysis for spot zoning is location specific, a zoning change that makes no actual changes on a map cannot, by definition, be spot zoning.

further because a proper facial challenge to the Text Amendment was not actually made in this case; Citizens' challenge was functionally an as-applied one, challenging the outcome of the new zoning as applied on the ground. In that challenge they have succeeded, obtaining a judicial invalidation of the Map Amendment. However, the Text Amendment remains valid.

¶50 Citizens also assert that the Commissioners violated both Montana law and Flathead County regulations regarding public participation in the process of adopting the Text Amendment. We note initially that it appears Citizens have conflated the more extensive statutory public participation requirements for adoption of growth policies, §§ 76-1-601 to -607, MCA; *see generally Citizens for a Better Flathead*, ¶¶ 32-49 (reviewing public participation process for growth policy amendment), with that required for zoning changes. Sections 76-2-201 to -205, MCA. Section 76-2-205(2), MCA, requires that, following notice of a public hearing on any proposed zoning, the "commissioners shall give the public an opportunity to be heard regarding the proposed zoning district and regulations." There is no statutory requirement that public comment be further evaluated, as with adoption of growth policies. Section 76-1-603, MCA. Commissioners are here required to "review the proposals of the planning board and shall make any revisions or amendments that it determines to be proper." Section 76-2-205(3), MCA.

¶51 Flathead County has enacted its own ordinance regarding public participation that applies more broadly. Resolution No. 2129 provides:

> In accordance with the principles announced by the court in *North 93 Neighbors v. Board of County Commissioners of Flathead County*, prior to making a *land use decision*, the Board shall summarize the relevant public comment received on a particular action and shall explain how such comment factors into the decision. The scope and format of such summarization and explanation may vary as appropriate for the type of decision and extent of public comment.

(Emphasis added.)  Although *North 93 Neighbors* pertained to growth policies, not zoning, *N. 93 Neighbors*, ¶¶ 37-38, 45, on the basis of that case Flathead County laudably adopted a broader requirement that encompasses all land use decisions, including the present one, and that requires "summarization and explanation" by the Commission in response to the receipt of public comment.  No specific requirement as to the form of this summary and explanation by the Commission is provided.

¶52 When the Text Amendment public hearing was held on May 17, 2011, public comment was received and the Commissioners orally responded with comments acknowledging the public input.  Commissioner Holmquist stated she would take the comments under consideration and Commissioner Lauman stated that "issues expressed to them need [to be] addressed."  Commissioner Lauman also expressed "concern regarding which public roads would be affected," a concern raised by the public comments.  The Commissioners then unanimously voted to undertake further consideration of the Text Amendment and Chairman Dupont asked the Planning Board to address the concerns that had been raised.

¶53 On May 31, 2011, the Commissioners met again to discuss the proposed Text Amendment.  The Commissioners responded to public concerns by explaining that the Text Amendment would not automatically zone any given property.  They also made

31

multiple changes to the language of the Text Amendment that came out of public workshops conducted about the proposed ordinance.

¶54 On July 27, 2011, the Commissioners acknowledged receipt of 881 protest letters. Commissioner Holmquist stated that she had read through all the protest letters. Commissioner Lauman said he "spent a lot of time" reading protests and noted "concerns about the quality of information put out there [regarding the B-2HG Text Amendment]." Addressing concerns raised, Commissioner Lauman stated he did "not see where B2HG zoning would impose anything on anyone that they can't already do." Commissioner Holmquist, describing "inaccurate and scare tactic information" in the protest letters, stated that the "B2HG is not replacing B2 zoning, and it does not cover every road in the county; it is only on major arterial roads." Finally, Chairman Dupont concurred with the other Commissioners, noting that "if [the B-2HG Text Amendment] passed today it would be an option for zoning that a property owner can choose from to further restrict development of their property." The Commission then adopted the Text Amendment.

¶55 Our review of the record leads to the conclusion that the Commission satisfied the statutory obligation to permit the public to be heard and, further, satisfied the obligations of the Flathead County ordinance by summarizing the concerns raised and explaining its position in light of those concerns. The Commission incorporated changes to the proposed Text Amendment in response to some comments. As such, the Text Amendment is not invalid for failure to comply with public participation requirements.

¶56    *3. Did the District Court err by granting attorneys' fees to Citizens?*

¶57    The District Court awarded attorneys' fees as both mandamus relief and under the Uniform Declaratory Judgment Act (UDJA), reasoning that award of attorneys' fees based on the claims made by Citizens were on "solid footing."  However, we disagree.

¶58    A writ of mandate is issued "to compel the performance of an act that the law specially enjoins as a duty resulting from an office, trust, or station."  Section 27-26-102, MCA.  Writs of mandate are available where (1) "the party who applies for it is entitled to the performance of a clear legal duty by the party against whom the writ is sought"; and (2) "there is no speedy and adequate remedy available in the ordinary course of law." *Smith v. Cnty. of Missoula*, 1999 MT 330, ¶ 28, 297 Mont. 368, 992 P.2d 834.

¶59    First, the clear legal duty "must involve a ministerial act, not a discretionary act." *Smith*, ¶ 28; *accord Jefferson Cnty. v. Dep't of Envtl. Quality*, 2011 MT 265, ¶¶ 21-22, 362 Mont. 311, 264 P.3d 715.  To determine if an act is ministerial or discretionary, we have held:

> [W]here the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial, but where the act to be done involves the exercise of discretion or judgment, it is not to be deemed merely ministerial.

*State ex rel. Sch. Dist. No. 29 v. Cooney*, 102 Mont. 521, 529, 59 P.2d 48, 53 (1936); *accord Smith*, ¶ 28; *Jefferson Cnty.*, ¶ 21.  We have held that zoning is a legislative, not ministerial, act. *N. 93 Neighbors, Inc.*, ¶ 18 ("Amending a growth policy or a zoning designation constitutes a legislative act."); *Liberty Cove, Inc. v. Missoula Cnty.*, 2009 MT 377, ¶ 12, 353 Mont. 286, 220 P.3d 617; *Schanz*, 182 Mont. at 335, 597 P.2d at 71 ("A

33

rezoning ordinance, like a zoning ordinance, is a legislative enactment.").  Thus, the actions of the Commission challenged here were not ministerial in nature.

¶60   Secondly, Citizens had a remedy at law.  "Any person aggrieved by any decision of the commission or the board of county commissioners may, within 30 days after such decision or order, appeal to the district court in the county in which the property involved is located."  Section 76-2-110, MCA.  Further, if Citizens were concerned about Flathead County implementing the Text Amendment or the Map Amendment, they could have sought preliminary injunctive relief pursuant to Title 27, chapter 19, MCA, pending judicial review of the ordinances.  As such, mandamus was not an available remedy in this case and did not provide a basis for an award of attorneys' fees.

¶61   Attorneys' fees are also potentially available in declaratory actions.  Section 27-8-313, MCA, of the UDJA provides that "[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper."  Accordingly, attorneys' fees are available under the Montana UDJA when the district court, in its discretion, "deems such an award necessary or proper."  *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶¶ 42, 46, 315 Mont. 210, 69 P.3d 663.  However, as a threshold question, equitable considerations must support an award of attorneys' fees.  *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 45, 354 Mont. 50, 221 P.3d 1230; *United Nat'l Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 38, 352 Mont. 105, 214 P.3d 1260; *Hughes v. Ahlgren*, 2011 MT 189, ¶ 13, 361 Mont. 319, 258 P.3d 439.  The availability of attorneys' fees is not "automatically presumed" and fees are not warranted in "garden variety" declaratory judgment actions, which would "eviscerate[]" the

34

American Rule. *Mungas*, ¶ 44; *Mont. Immigrant Justice Alliance v. Bullock*, 2016 MT 104, ¶ 48, 383 Mont. 318, 371 P.3d 430; *W. Tradition P'ship v. Att'y Gen. of Mont.*, 2012 MT 271, ¶¶ 11-12, 367 Mont. 112, 291 P.3d 545.

¶62 Citizens sought a judicial declaration concerning the validity of the subject zoning ordinances. This action constituted a garden variety declaratory action brought by citizens that does not involve equitable considerations compelling a fee award. As such, the grant of fees under the UDJA was improper.

## CONCLUSION

¶63 The judgment of the District Court invalidating the Map Amendment is affirmed. We conclude that the District Court did not also invalidate the Text Amendment, and for the reasons set forth herein, that judgment, challenged on cross appeal, is also affirmed. The award of attorneys' fees to Citizens is reversed.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON