FILED

01/27/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0260

DA 25-0260

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 8

THOMPSON CHAIN OF LAKES
STEWARDSHIP COALITION, a
Montana nonprofit public benefit
corporation, JAMES M. WATKINS,
and JOHN W. WICKERSHAM,

Plaintiffs and Appellants,

v.

BOARD OF COUNTY COMMISSIONERS OF
LINCOLN COUNTY, a political subdivision of
the State of Montana and the governing
body of the County of Lincoln, acting
by and through its County Commissioners,
Brent Teske, Josh Letcher, and Jerry Bennett,

Defendant and Appellee,

and

HAPPY'S RV PARK, INC., a Montana
for profit corporation and PARKS
FAMILY REAL ESTATE, LLC, a Montana
limited liability company,

Intervenors and Appellees.

APPEAL FROM:     District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DV-22-165
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Robert Farris-Olsen, David K. W. Wilson, Jr., Morrison, Sherwood,
Wilson & Deola, PLLP, Helena, Montana

For Appellee Board of County Commissioners of Lincoln County:

    Alan F. McCormick, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

For Appellees Happy's RV Park, Inc. and Parks Family Real Estate, LLC:

    Angela M. LeDuc, Austin King, Rocky Mountain Law Partners, P.C., Kalispell, Montana

Submitted on Briefs:  December 17, 2025

Decided:  January 27, 2026

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1    Thompson Chain of Lakes Stewardship Coalition, et al., (collectively, TCLSC) appeal the March 2025 order of the Montana Nineteenth Judicial District Court granting summary judgment to the Lincoln County Board of County Commissioners (the County) and Intervenors Happy's RV Park (Happy's) that the County complied with §§ 76-3-603 and -608, MCA, the Thompson Chain of Lakes Neighborhood Plan, and the Lincoln County Growth Policy in granting conditional approval of Happy's preliminary subdivision plat.

¶2    We address the following restated issues:

1. *Did Happy's environmental assessment satisfy the requirements of § 76-3-603(1)(a), MCA?*

2. *Did the County consider the "specific, documentable, and clearly defined impact" on "the natural environment, wildlife, wildlife habitat, and public health and safety" as required by § 76-3-608(3)(a), MCA?*

3. *Did the proposed subdivision comply with the Thompson Chain of Lakes Neighborhood Plan and County Growth Policy?*

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    In March 2022, APEC Engineering applied on behalf of Happy's to develop a seasonal RV park in the Thompson Chain of Lakes area.  The RV park will have 69 RV spaces and 20 tent spaces, developed in four phases, and will be located on a 21-acre parcel (Lot 20) of the previously approved Montana Lakes Subdivision, which anticipated

3

development of Lot 20 as an RV park when platted. The proposed RV park is located just off Highway 2 and across from a popular restaurant, bar, and gas station.

¶4 The Lincoln County Planning Department accepted the application, prepared a subdivision report, and noticed a public meeting set for July 2022. In its report, the Planning Department concluded the RV park development complied with the Growth Policy and Neighborhood Plan because other commercial services are concentrated in the same area. In response to public safety concerns, the County asked the Montana Department of Transportation (MDOT) to address speed and approach issues on Highway 2. The Planning Department recommended preliminary approval of the RV park.

¶5 The County then set and noticed a public hearing on the application for August 10, 2022, and solicited public comment. At that meeting, attendees raised concerns regarding traffic safety, overburdening emergency services and access to nearby lakes, groundwater usage, and potential contamination from RV park sewage. At its next regular meeting in late August, the County learned that not all adjacent landowners received notice of the August 10 hearing, so it postponed decision-making and set another public hearing for September 14, 2022.

¶6 On September 13, 2022, TCLSC submitted written comment, asserting that (1) the Planning Department's July 2022 subdivision report and developer submissions contained errors and omissions; (2) the proposed RV park was inconsistent with the Neighborhood Plan and Growth Policy; (3) Happy's environmental assessment was insufficient; and (4) the RV park would adversely impact groundwater, public safety, the natural

4

environment, and wildlife. The County also received 60-some additional written public comments prior to the second hearing.

¶7 There was a large turnout for the September 14 public hearing. The County heard comments from TCLSC and many other opponents and proponents of the RV park. In response to public concern, APEC Engineering confirmed that the subdivision's water and sewer plans would be reviewed by Montana Department of Environmental Quality (MDEQ).

¶8 At the next regular meeting on September 21, 2022, the County confirmed it had reviewed all submitted documents and public comment and conditionally approved Happy's preliminary plat, subject to 15 conditions for final plat approval. Among those conditions was that "a letter from DEQ granting approval for the proposed water and sewer systems must be submitted with the final plan application."

¶9 Afterward, TCLSC initiated a district court action to set aside the County's approval decision. Happy's intervened as defendants. With no disputed material facts, the parties each filed motions for summary judgment. The pertinent legal questions presented were whether (1) the County's decision complied with §§ 76-3-603 and -608, MCA; and (2) the RV park complied with the Neighborhood Plan and Growth Plan.[1]

¶10 After hearing oral argument, the District Court granted summary judgment to the County and Happy's on all legal issues. TCLSC timely appeals.

---

[1] The parties also disputed whether the County afforded meaningful opportunity for public participation at the September 14 hearing and considered all public comment in its approval decision. The District Court granted summary judgment to defendants on this issue. TCLSC does not challenge this aspect of the court's judgment on appeal.

5

**STANDARD OF REVIEW**

¶11     Under § 76-3-625(2), MCA, a party aggrieved by a local governing body's decision to approve, conditionally approve, or deny a proposed subdivision may appeal that decision to district court.  We review a district court's decision on review to determine whether the record establishes that the governing body acted arbitrarily, capriciously, or unlawfully. *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 31, 356 Mont. 451, 230 P.3d 808; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 65, 360 Mont. 207, 255 P.3d 80.

**DISCUSSION**

¶12     Montana's Subdivision and Platting Act (MSPA) governs local review and approval of subdivisions.  A subdivision application must include a preliminary plat and water and sanitation report.  Sections 76-3-601(1), -622, MCA.  When required, the application must also include an "environmental assessment" (EA)[2] containing the following information:

> (i)      a description of every body or stream of surface water that may be affected by the proposed subdivision, together with available ground water information, and a description of the topography, vegetation, and wildlife use within the area of the proposed subdivision;
>
> (ii)     a summary of the probable impacts of the proposed subdivision based on the criteria described in § 76-3-608, MCA;
>
> (iii)    a community impact report containing a statement of anticipated needs of the proposed subdivision for local services, including education and busing; roads and maintenance; water, sewage, and solid waste facilities; and fire and police protection; and

---

[2] Section 76-3-603, MCA, does not specify when an environmental assessment is required.  It also identifies separate requirements for EAs for "major" and "minor" subdivisions.  The parties here agree that the requirements for a "major" subdivision EA apply to the proposed Lot 20 development.

6

(iv)  additional relevant and reasonable information related to the applicable regulatory criteria adopted under § 76-3-501, MCA,[3] as may be required by the governing body.

Section 76-3-603(1)(a), MCA.

¶13   Section 76-3-608, MCA, prescribes how local governing bodies are to review and approve proposed subdivisions.  In this case, the County could conditionally approve Happy's RV Park only if the subdivision application, preliminary plat, EA, public hearing, Planning Department recommendation, and pertinent additional information demonstrated that the development met the requirements of the MSPA.  Section 76-3-608(1), MCA.  In deciding whether to approve the RV park, the County had to consider, as pertinent here:

> the specific, documentable, and clearly defined impact on agriculture, agricultural water user facilities, local services, the natural environment, wildlife, wildlife habitat, and public health and safety, excluding any consideration of whether the proposed subdivision will result in a loss of agricultural soils.

Section 76-3-608(3)(a), MCA.[4]

¶14   Upon review, the County had to issue written findings "based on the record as a whole" and weighing the § 76-3-608(3), MCA, criteria.  Sections 76-3-608(2), (10), -620, MCA.  The MSPA specifically provides that the County's factual findings "must be sustained unless they [were] arbitrary, capricious, or unlawful."  Section 76-3-608(10), MCA; *accord* § 76-3-625(2)(c), MCA ("the governing body's decision, based on the record

---

[3] Section 76-3-501, MCA, requires local governing bodies to adopt their own subdivision regulations.  Lincoln County has promulgated subdivision regulations pursuant to this statute.

[4] Section 76-3-608(3), MCA, lists numerous criteria a governing body must consider.  TCLSC does not argue that the County failed to consider any criteria other than § 76-3-608(3)(a), MCA.

7

as a whole, must be sustained unless the decision being challenged is arbitrary, capricious, or unlawful"). An agency action is unlawful when it fails to comply with the requirements of applicable statutes. An arbitrary or capricious decision does not mean only that "the record contains inconsistent evidence or evidence which might support a different result"; rather, the decision "must appear to be random, unreasonable, or seemingly unmotivated, based on the existing record." *Aspen Trails*, ¶ 31 (citation omitted).

¶15    *1. Did Happy's environmental assessment satisfy the requirements of § 76-3-603(1)(a), MCA?*

¶16    TCLSC first takes issue with the sufficiency of Happy's EA under § 76-3-603(1)(a), MCA. They argue that the EA was insufficient for meaningful County review because it: (1) failed to identify and describe surface water and groundwater that "may be affected" by the RV park; and (2) failed to describe wildlife use "within the area" of the proposed subdivision.

**A. Surface Water and Available Groundwater Information**

¶17    Happy's provided several documents that the parties agree constituted its required environmental assessment. Of those, the EA contained a water and sanitation report submitted pursuant to §§ 76-3-601(1) and -622, MCA. That report contained a lot layout, public water and wastewater system proposals, vicinity maps for nearby wells, logs for those wells, water sampling results, a USDA soils report and test hole logs, and stormwater analysis and proposed drainage system.

¶18    The EA reported no surface water on the mostly flat, mostly timbered Lot 20 or within proximity of being impacted by the development. The proposed site contains no

8

natural or artificial water systems, i.e., no rivers, streams, intermittent streams, lakes, marshes, or irrigation works, no nearby agricultural operations, and is not in a floodplain. The closest surface waters to the site are Lavon and Crystal Lakes, located approximately 1,200 feet south across Highway 2. TCLSC contends that these lakes are "spring fed, with no known outlets or inlets."

¶19 The subdivision plan proposes a community water system (2 wells) and wastewater system (4 individual septic systems). To demonstrate water availability, the EA included well logs from eight wells in the vicinity. These wells ranged in total depth from 25 to 80 feet and had static water levels from 6 to 54.6 feet (total depth averaged around 51 feet; static water level averaged around 36 feet). Soil reports showed the soil was "excessively drained" with a depth to the water table at "more than 80 inches." However, the EA reported that "location and depth of all aquifers which may be affected by the proposed subdivision are unknown and have not been determined" and the "location of aquifer recharge areas is unknown and undetermined." But, due to "deep static water levels, well-drained soils, and low-density development," it was "unlikely that aquifer recharge areas will be affected." Further, the RV park's water systems are subject to separate MDEQ nondegradation review and approval. Based on the available information and required MDEQ approval, Happy's stated that groundwater depletion or degradation was unlikely to result from the subdivision.

¶20 TCLSC contends the EA was required to identify nearby Lavon and Crystal Lakes as surface waters that "may be affected" by the RV park development. In support,

9

TCLSC points to a 1993 Montana Fish, Wildlife and Parks (FWP) Management Plan and Environmental Assessment that identified Thompson Chain of Lakes as potentially susceptible to adverse impacts from nearby recreational land-use activities. TCLSC also contends the EA failed to:

> describe the nature of the aquifer beneath the Subdivision in terms of its hydrologic characteristics, including whether it was confined, what the transmissivity or storativity is for the relevant aquifer, direction of flow and potential impacts on adjacent landowners' wells and existing water uses, or whether and to what extent nearby surface waters interact with and are recharged by the same aquifer,

pointing again to the 1993 FWP EA as "publicly available" information describing Chain of Lakes hydrology.[5]

¶21 The County and Happy's counter that the 1993 FWP EA was intended only to evaluate proposed use and management alternatives for a 4,000-acre land donation and was not a definitive study on Chain of Lakes hydrology. The text of the 1993 EA supports the defendants' argument. In describing the lakes' groundwater environment, it explicitly says, among other things, that "groundwater movement through . . . the Thompson Chain of Lakes basin is difficult to predict and may be locally complex"; there was a "lack of water quality test data available for the preparation" of the 1993 EA; and "adequate data [was] not available to make specific predictions" as to land use impacts on the lakes.

---

[5] TCLSC also repeatedly points to a purported 2001 MDEQ "study . . . concerning groundwater and substrate." This "study" is not part of the administrative record. In fact, it was only tangentially referred to in a letter included in Happy's application materials. In the 2009 letter from MDEQ to someone associated with the nearby Lavon Estates subdivision, MDEQ referenced another "2001 letter" referencing a prior nondegradation study purportedly identifying groundwater flow "in the area" of that subdivision.

¶22 Moreover, the administrative record here shows that the information TCLSC believes should have been included in the EA is not currently available because it is the subject of ongoing, but not yet completed, scientific research. In its September 2022 written comment, TCLSC repeatedly referenced a newly-initiated and ongoing Montana School of Mines and Geology (MSMG) groundwater and aquifer study of the Thompson Chain of Lakes area. The study will map "aquifer locations and extents," map the "groundwater flow system," and assess water quality in the lakes area. As of September 2022, the results of this study were 3-5 years away. TCLSC also submitted a "hydrological assessment" letter written by retired Alaska hydrologist, Steven Paustian, who likewise acknowledged that "contemporary water resource information to help guide sustainable development in the TCL Management Area is severely lacking," as is "recent water quality data to assess the current health of TCL water bodies." He believed the "recently initiated [MSMG] study is a good first step toward addressing these critical information needs." Many of the public comments opposing the development also pointed to this ongoing hydrogeological study as grounds to delay approval.[6] The County's public meeting minutes noted comments about this ongoing study.

¶23 Section 76-3-603(1)(a), MCA, requires an EA to identify water bodies that "may be affected," provide "available ground water information," and summarize "probable impacts" to § 76-3-608, MCA, criteria, namely, as pertinent here, "the natural environment." Section 76-3-608(3)(a), MCA, further requires that these "probable"

_____

[6] Plaintiff John Wickersham noted that the "recharge and extent of the aquifer is currently being assessed" by MSMG.

11

impacts be "specific, documentable, and clearly defined" so as to permit meaningful review based on best-quality available information. Read together, these statutory provisions require a developer to identify and describe waters that will *likely* be affected by the development.

¶24 Despite TCLSC's claims that the EA had to identify Lavon and Crystal Lakes as surface waters that "may be affected" by the RV park, these water bodies are located 1,200 feet from the development and are separated from the development by a highway, a business, and private residences. No surface water exists on Lot 20, and Lavon and Crystal Lakes have no inlets, meaning there is no surface water connection between these lakes and the proposed development.

¶25 Further, TCLSC's claim that the EA had to identify the nature and hydrology of the "relevant aquifer," including its transmissivity, storativity, directional flow, and how nearby surface waters interact with and are recharged by it, asks for information beyond the requirements of § 76-3-603(1)(a), MCA. That information is the subject of an ongoing hydrogeological study and not yet publicly available. The 1993 FWP EA likewise acknowledged the lack of aquifer and connectivity data. Where, as here, the record establishes that the relevant hydrogeological data does not yet exist and is the subject of ongoing study—i.e., was not "available"—the statute does not require the EA to include that information.

¶26 TCLSC likens the EA submitted here to the deficient EA in *Aspen Trails*. The EA there noted groundwater depths but did not include any available interpretive information

12

pertinent to the probable impacts, such as a USGS groundwater report and well log data, even though that information was available. *Aspen Trails*, ¶¶ 17-18. We affirmed the district court's decision to vacate subdivision approval where the EA was insufficient under § 76-3-603(1)(a), MCA, to permit meaningful review of the effects of the development on the "extremely shallow" groundwater in the area. *Aspen Trails*, ¶¶ 46-50, 55-58. *Aspen Trails* is distinguishable.

¶27 First, TCLSC's claim that groundwater in Lot 20 is similarly "shallow" does not alter the legal analysis under § 76-3-603(1)(a), MCA, and is, in any event, not supported by the well log data in the record. EA well logs show that nearby wells range in total depth from 25 to 80 feet and static water levels range from 6 to 54.6 feet. A single 25-foot well located near the proposed site has static water at 6 feet; the next most shallow well was 39 feet deep with static water at 28 feet and the deepest well went to 80 feet with static water at 54.6 feet.[7] The average well depth was around 51 feet with static water at 36 feet. Citing to the EA, TCLSC claims the water table in the area is *at* 80 inches (6'8"), but the EA reports the water table at a depth *greater than* 80 inches. Second, and most importantly, the deficient EA in *Aspen Trails* did not contain any well log data, though it existed, and did not contain a USGS groundwater report for the subdivision area, though it existed. *Aspen Trails*, ¶¶ 17-18. Despite TCLSC's claims, the EA did not "omit" groundwater and aquifer recharge information for the development area because that information is the subject of an ongoing scientific study and not currently available.

---

[7] TCLSC incorrectly states that two wells were 25 feet deep with static water at 6 feet; only one well was this shallow.

¶28    The record shows that Happy's EA accurately reported no surface water likely to be affected by the development and supplied all "available ground water information," as § 76-3-603(1)(a), MCA, requires.

**B. Wildlife Use in the Area**

¶29    The EA reported that the development site contained no surface water, riparian habitat, or waterfowl nesting area. Lot 20's timbered land could host ungulates (deer, elk, or moose) and black bear, as well as some avian species, though it was not "preferred forage."[8] The EA did not identify any specific, documentable, and clearly defined adverse impacts on wildlife. The EA also reported that the Neighborhood Plan did not identify any species of concern or wildlife corridors within or adjacent to the project site.[9]

¶30    After the first public hearing, FWP provided input on the proposed development, supplying its written comments for the 2021 Mountain Lakes Subdivision Phase II, the development phase for an RV park on Lot 20. FWP noted that (1) bald eagle nests were observed in proximity to the development but were over one-half mile away; (2) migratory birds frequented the lakes area, but common loons were nesting across the highway, not on development land; (3) two collared grizzlies used the area from 2010-2018, indicating a need for bear-proof storage; (4) other predators "can exist" anywhere their prey does, but

---

[8] Though not formally part of the EA, Happy's application letter noted "the potential appearance of the black bear within the Happy's Inn community," and that "the grizzly bear, mountain lion or wolf may inhabit the total surrounding region, but likely not encounter the project site."

[9] The Neighborhood Plan's "Unique Features Map" (A-3) identifies the common loon as a "species of concern," but does not show it present in the development area. Rather, the map shows loons on Crystal Lake. The map also identifies general locations of "likely big game movement corridors," but none are in or near the development area.

14

it did not mention the presence of wolves, coyotes, or mountain lions in or near the development area; and (5) subdividing property generally fragments winter range. To limit human-wildlife interactions, FWP recommended underground powerlines, fencing, cluster design leaving open space for wildlife movement, and implementing and enforcing written guidelines for residents and visitors.

¶31 TCLSC says the EA is deficient because it did not specifically discuss the presence of and impacts on "federally protected Bald Eagles, trumpeter swans, heron, common loons, and other migratory birds" and "predators like mountain lions, coyotes, wolves, and grizzly bears," although FWP comment was available and "provided the information necessary to complete the EA."

¶32 Consistent with § 76-3-603(1)(a), MCA, the EA provided the required "description of . . . wildlife use within the area of the proposed subdivision" and identified no "probable impacts" from the development. Though the Chain of Lakes area is home to numerous wildlife species, including ungulates, migratory birds, and large predators, RV park development within an area already commercially and residentially developed was unlikely to adversely impact wildlife. The EA reported, correctly, that the Chain of Lakes Neighborhood Plan identified no species of concern or wildlife corridor in the Lot 20 development area. The MSPA does not require a developer to identify species that are not present within the development area or speculate about adverse impacts beyond those that are specific, documentable, and clearly defined.

¶33 Contrary to TCLSC's assertions, the EA was not deficient because it failed to incorporate FWP's comments. First, FWP's comments *confirm* the EA's unlikely-impact assessment. The species TCLSC identifies—bald eagles, common loons, other migratory birds, mountain lions, wolves, and coyotes—were not actually within the proposed development area. For species that were or could be in the area, the EA identified no specific, documentable, and clearly defined probable impact. FWP similarly identified no specific, documentable, and clearly defined adverse impact on wildlife or wildlife habitat attributable to the proposed subdivision.

¶34 Second, the County subsequently remedied any failure of the EA to identify the presence of grizzly bears within the development area from 2010-2018 by considering supplemental FWP comments under § 76-3-608, MCA, *infra*, as part of the "record as a whole." The MSPA distinguishes between the statutory requirements governing the contents of an EA and the broader record on which a governing body must base its approval decision. The MSPA expressly contemplates that subdivision review will be informed not only by the EA itself, but also by information received through the public hearing process and agency consultation. *See* § 76-3-608(1), (10), MCA; *accord Citizens for Responsible Dev. v. Bd. of Cnty. Comm'rs*, 2009 MT 182, ¶¶ 20-26, 351 Mont. 40, 208 P.3d 876. Accordingly, agency comments submitted during the review process—including those from FWP—properly form part of the "record as a whole" upon which the governing body bases its findings, even if they were not incorporated into the initial environmental assessment.

16

¶35   Here, the EA correctly reported no surface water on Lot 20 and Lavon and Crystal Lakes, separated from the development by a highway and commercial and residential property, were unlikely to be affected because neither had an inlet. The EA contained available groundwater information as required and identified no probable adverse impacts to wildlife or wildlife habitat, a report confirmed by FWP's impact assessment and the Neighborhood Plan. Accordingly, we hold that the information provided in the EA satisfied the criteria of § 76-3-603(1)(a), MCA, thereby permitting the County to conduct meaningful review of the proposed subdivision under § 76-3-608, MCA.

¶36   *2. Did the County consider the "specific, documentable, and clearly defined impact" on "the natural environment, wildlife, wildlife habitat, and public health and safety" as required by § 76-3-608(3)(a), MCA?*

¶37   TCLSC next contends that the County did not comply with the requirement of § 76-3-608(3)(a), MCA, to consider "the specific, documentable, and clearly defined impact" of the RV park on "the natural environment, wildlife, wildlife habitat, and public health and safety." Specifically, TCLSC asserts that the County (1) "ignor[ed] the hydrogeology of the area" and failed to (2) address impacts on big game, predators, birds, and fish; (3) evaluate impacts of increased recreational use on adjacent public lands, namely, the Chain of Lakes State Park; and (4) consider public safety risks attendant to increased vehicular and pedestrian traffic near the highway.

¶38   As a preliminary matter, TCLSC insists that the County's approval decision was unlawful in many respects simply because it was based on a "deficient" EA. We have already determined that Happy's EA satisfied the requirements of § 76-3-603(1)(a), MCA.

17

In any event, an EA is only a part of the record that must form the basis for an approval decision. Section 76-3-608(1), MCA, makes clear that an approval decision must be based on "the subdivision application, preliminary plat, applicable environmental assessment, public hearing, planning board recommendations," and any pertinent "additional information." *See also* § 76-3-608(10), MCA (decision "must be based on the record as a whole"). The MSPA also makes clear that an approval decision will stand unless "arbitrary, capricious, or unlawful." Section 76-3-608(10), MCA. This means that so long as the governing body complies with the statutory requirements for review and approval, its decision is reversible only if "random, unreasonable, or seemingly unmotivated" in light of the existing record. *Aspen Trails*, ¶ 31.

**A. "Hydrogeology of the Area"**

¶39 TCLSC claims the County ignored public comment, including Paustian's "hydrological assessment," which indicated that any use of groundwater and septic systems within the development would "likely impact" the nearby lakes. As noted by TCLSC, Paustian's letter relied "extensively" on the 1993 FWP EA. As discussed above, FWP acknowledged the 1993 EA's shortcomings—specifically, that adequate data regarding groundwater connectivity, aquifer recharge, and Chain of Lakes water quality was not available at the time the EA was prepared.

¶40 Section 76-3-608(3)(a), MCA, requires the County to consider specific, documentable, and clearly defined impacts. The MSPA does not condition subdivision approval on the resolution of scientific uncertainty and does not require a

18

governing body to delay a decision until long-term regional studies are completed. Rather, §§ 76-3-603(1)(a) and -608(3)(a) require consideration of *available* information sufficient to identify *probable* impacts that are "specific, documentable, and clearly defined." Where, as here, the record establishes that the relevant hydrogeological data does not yet exist and is the subject of ongoing study, the statute does not require the County to speculate or to deny approval based on uncertainty alone.

¶41    Here, the County considered available scientific groundwater information, which included well logs and soil reports, in addition to myriad anecdotal public comments that lake water levels had dropped in recent years and that a nearby well recently went dry for the first time in 50 years. Many of the public comments, including TCLSC's, however, stated that groundwater and aquifer connectivity data was unavailable, hence the recently-initiated MSMG hydrogeological study. The record reflects that the County considered impacts to surface water and groundwater that were specific, documentable, and clearly defined; the statute does not require consideration of unknown or merely speculative impacts.

¶42    Further, to ensure that the proposed public water and wastewater systems will comport with state-imposed water use and quality standards, the County conditioned final plat approval on MDEQ review and approval of those systems, pursuant to MDEQ's own regulatory authority. *See generally* Title 75, chapter 5, part 4 (MDEQ discharge permits), part 7 (mandatory MDEQ water quality monitoring and assessment), and chapter 6, part 1,

MCA (MDEQ regulation of public water supply).[10] TCLSC does not deny that MDEQ will oversee public water and wastewater systems in the RV park; in fact, they cite to numerous MDEQ rules in briefing on appeal.

## B. Big Game, Predators, Birds, and Fish

¶43 TCLSC argues the County did not meaningfully consider impacts on wildlife, instead summarily concluding only that the proposed RV park "is in an area that may contain habitat for general/winter range for moose, elk, bear, whitetail and mule deer typical of many areas of Lincoln County" but there did not "appear to be a significant impact to wildlife or wildlife habitat." TCLSC's position is essentially that, because the County did not expressly discuss every issue raised by FWP, it did not meaningfully consider these issues.

¶44 But, like FWP, the County concluded that the development area was year-round habitat for ungulates and bears. While FWP noted that surrounding areas were seasonally home to migratory birds, including common loons nesting on the nearby lakes, and that bald eagles nested over a half-mile away, it did not specifically identify any ways the RV park development would adversely impact these species. Likewise, though FWP generally noted that large predators would follow their ungulate prey, it did not state that wolves, mountain lions, or coyotes were actually present in the development area. Finally, TCLSC faults the County for not identifying impacts on lake fish, despite those issues

---

[10] See also § 76-3-501, MCA, and Lincoln County's Subdivision Regulations (July 8, 2020) (VI-T-10 requires that an RV park water/wastewater design "shall, at a minimum, comply with DEQ Standards").

being raised in public comment. Besides general public concern for lake health and anecdotal experiences, the record does not contain any evidence of actual probable impact on lake fish habitat. The record as a whole here demonstrates that the County considered the "specific, documentable, and clearly defined" impacts on wildlife and wildlife habitat—all that § 76-3-608(3)(a), MCA, requires.

¶45 Moreover, the County's approval decision reflects meaningful consideration and implementation of FWP's comments—requiring Happy's to install bear-proof waste bins and post and enforce FWP's "Living With Wildlife" provisions. The RV park will also have underground powerlines and perimeter fencing on the highway side, and it implements a cluster design with an open-space ring around the RV lots. These are the exact measures FWP recommended to minimize any human-wildlife interactions and impact.

## C. Nearby Public Lands

¶46 The County concluded the development was not immediately adjacent to public land, though it was in proximity to the greater Chain of Lakes State Park area, which is managed by FWP primarily for recreational use. TCLSC argues "adjacent public lands" includes the nearby lakes' public use and access infrastructure and that the County failed to consider the impacts of increased recreational use on these features. Defendants contend the development is immediately surrounded by commercial and residential properties, not "public land," and the County was not required to consider recreational-use impacts on the nearby 3,000-acre state park under § 76-3-608(3)(a), MCA. Without deciding whether the

21

"natural environment" criterion includes impacts on boat ramps, picnic areas, restroom facilities, or other use/access infrastructure, we conclude the record does not show that the proposed development would adversely impact recreational use.

¶47    FWP did not identify any specific impacts of the RV park development on area recreation.  It noted only that increased development in the lakes area overall could "potential[ly]" impact competition for day-use facilities and demand on public amenities, which FWP said "may result in more intensive site management" by the agency.  FWP did not specifically state if or how the RV park development would impact recreational use and instead referred the County to the Neighborhood Plan and its stated goals and guidelines for area development.  For reasons explained below, the County considered how the RV park development fit within the Growth Policy and Neighborhood Plan.

¶48    Other than FWP's comment, the record contained only generalized public concerns about crowding due to increased summer traffic from RV park visitors.  Even assuming proximity to heavily used public lands, the MSPA requires evidence of a specific, documentable, and clearly defined impact attributable to the proposed subdivision.  The record contains no such evidence regarding adverse impacts on public recreational facilities or state-managed lands resulting from this development.

D.  Public Health and Safety

¶49    Finally, TCLSC argues the County failed to evaluate impacts of increased vehicular and pedestrian traffic on and crossing Highway 2 near the RV park.[11]  They point to a letter

---

[11] TCLSC concedes that Highway 2 "is able to handle" the anticipated additional vehicle traffic.

from the fire chief indicating increased vehicle traffic would create a "huge safety risk" for pedestrians crossing the highway to access the restaurant, bar, and convenience store across from the RV park. But the Planning Department noted these concerns in its July 2022 subdivision report, after which the county asked MDOT to conduct a speed study of Highway 2 in the area and potentially lower the speed limit from 70 mph. While MDOT permitted creation of a turn lane into the park, it has apparently concluded its speed study and denied the county's request to lower the speed limit in the area. The State's later determination that a speed limit change was not warranted does not negate the County's consideration of public safety impacts from increased vehicular and pedestrian traffic in the area as required by § 76-3-608(3)(a), MCA.

¶50 Accordingly, we hold that the County considered the "specific, documentable, and clearly defined" impacts of the RV park development on "the natural environment, wildlife, wildlife habitat, and public health and safety," as required by § 76-3-608(3)(a), MCA.

¶51 *3. Did the proposed subdivision comply with the Thompson Chain of Lakes Neighborhood Plan and County Growth Policy?*

¶52 TCLSC argues that, under *Heffernan*, the RV park development had to "substantially comply" with the County's Growth Policy and Thompson Chain of Lakes Neighborhood Plan. TCLSC says the proposed development is inconsistent with the Plan's land-use designations and overall wildlife and natural environment protection goals.

23

**A. Required Consideration of the Growth Policy and Neighborhood Plan**

¶53 Although growth policies and neighborhood plans are expressly not "regulatory documents," § 76-1-605(2)(a), MCA, governing bodies must nevertheless be "guided by and give consideration to the general policy and pattern of development set out in the growth policy" when making land-use decisions. Section 76-1-605(1), MCA.[12]

¶54 We have rejected the view that growth policies are merely aspirational documents that may be disregarded at will. In *Heffernan*, ¶¶ 77-78, we explained that while a land-use decision need not strictly comply with every provision of a growth policy, it must substantially comply with the policy's goals, objectives, and recommendations when viewed as a whole. Treating growth policies as documents that may be freely ignored would "undercut" their value and "squander the substantial resources that are expended in developing them." *Heffernan*, ¶ 77.

¶55 At the same time, § 76-1-605(2)(b), MCA, prohibits a governing body from denying a land-use approval solely based on growth-policy compliance. Accordingly, the inquiry here is not whether the proposed subdivision perfectly conforms to the Neighborhood Plan, but whether the County reasonably considered the Plan and whether the approval represents a significant deviation from its central land-use framework. *Accord Heffernan*, ¶ 82; *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 325, ¶¶ 23-26, 385 Mont. 505, 386 P.3d 567.

---

[12] Lincoln County's Subdivision Regulations provide that "in making its decision to approve, conditionally approve or deny a proposed subdivision, the governing body and/or planning board may consider . . . [t]he Lincoln County Growth Policy." III-A-4(j)(iii)(D).

**B. Compliance with the Growth Policy and Neighborhood Plan**

¶56    The Thompson Chain of Lakes Neighborhood Plan was developed over several years with participation from local landowners, Lincoln County, FWP, and other agencies. The Plan identifies land-use designations and associated allowable uses, including Neighborhood Commercial (NC), Community Density (CD), and Rural Density (RD). The Plan's use tables expressly contemplate RV parks in CD and RD designations, but not in NC areas.

¶57    The Plan further emphasizes several core objectives relevant here:

(1)    preventing "strip commercial development" along Highway 2;

(2)    directing more intensive development to appropriate locations while protecting water quality, wildlife habitat, and the natural landscape; and

(3)    balancing recreational use with environmental constraints in the Thompson Chain of Lakes corridor.

The Plan's land-use map designates the RV park development within an NC area, with CD areas located separately. Although the Plan describes these designations as "conceptual" absent zoning, it also states that the map is intended to "guide new development to the appropriate locations" and to discourage strip commercial development along the highway.

¶58    In approving the preliminary plat, the County concluded that the RV park was consistent with the Neighborhood Plan because it was located within an existing "node" of more intensive use near Highway 2, adjacent to existing commercial development and public services. The Planning Department and County emphasized that this location

represented the most developed commercial area in this region of the Chain of Lakes and that concentrating recreational development at this node aligned with broader growth policy goals encouraging development near existing infrastructure.

¶59    The County did not treat the Neighborhood Plan as binding or dispositive. Instead, it acknowledged the Plan's goals regarding recreational use, economic activity, and concentration of development, while also recognizing its non-regulatory nature. TCLSC argues that approval of an RV park in an NC-designated area is categorically inconsistent with the Neighborhood Plan because the Plan's land-use tables do not list RV parks as an allowed use in those areas. That argument, however, assumes that the Plan's land-use tables operate as regulatory prohibitions rather than as guiding recommendations. Section 76-1-605, MCA, and *Heffernan* foreclose that interpretation. Where a growth policy reflects multiple, sometimes competing objectives, the MSPA does not require a governing body to adopt the interpretation that project opponents advance, but only to articulate a rational, record-based explanation for how the approved development fits within the policy when viewed as a whole.

¶60    Unlike *Heffernan*, where the governing body approved zoning that permitted densities five times greater than those recommended in the growth policy—an action we described as a "significant deviation" undermining the plan's core objectives—this case involves a discretionary subdivision approval in an unzoned area, where the County articulated a rationale grounded in the Plan's broader development pattern. *Heffernan*, ¶ 82. The County's decision reflects an effort to harmonize multiple

26

Plan objectives: concentrating intensive recreational use near existing commercial development, avoiding dispersal of such uses throughout less developed portions of the corridor, and supporting the area's recreational economy. While the Plan expresses concern about strip commercial development, the County reasonably distinguished between linear highway strip expansion and development within an already-established commercial cluster.

¶61 Viewed as a whole, the record demonstrates that the County considered and was guided by the Neighborhood Plan. The County acknowledged the Plan, identified relevant goals, and articulated a rational basis for concluding that the proposed RV park fit within the Plan's intended development pattern for this particular location. Under the deferential standard applicable to subdivision approvals,[13] the decision does not reflect the kind of stark or unexplained departure from the Plan's central framework that warranted reversal in *Heffernan* or *Citizens for a Better Flathead* or rise to the level of a failure to substantially comply with the Growth Policy. As such, preliminary plat approval was not unlawful, arbitrary, or capricious.

## CONCLUSION

¶62 We hold that Happy's EA satisfied the requirements of § 76-3-603(1)(a), MCA, permitting meaningful County review of probable impacts of the proposed subdivision. We further hold that the County considered the specific, documentable, and clearly defined impacts of the development on the natural environment, wildlife and wildlife habitat, and

---

[13] *Aspen Trails*, ¶ 31; *Heffernan*, ¶ 65; §§ 76-3-608(10), -625(2)(c), MCA.

public safety, as required by § 76-3-608(3), MCA. The County's decision conditionally approving the preliminary plat for Happy's RV Park was not unlawful, arbitrary, or capricious. The District Court's March 2025 decision on summary judgment is affirmed.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON

28